ARTHUR P. O'HARA vs. RYLAND E. ROBBINS,
individually and as executor, & others.[1]

Hampden. January 19, 1982. — March 12, 1982.

Present: GOODMAN, CUTTER, & BROWN, JJ.

*Corporation*, Corporate opportunity. *Limitations, Statute of. Practice, Civil*, Findings by judge. *Evidence*, Federal corporate tax returns. *Damages*, Attorney's fees.

In an action by the owner of twenty percent of the shares of a corporation against the two owners of the remaining shares and a second corporation owned by the two majority stockholders and engaged in the same business as the first, the judge was justified, in the circumstances, in concluding that in operating the second corporation the defendants had wrongfully appropriated a corporate opportunity belonging to the first corporation. [283-284]

In the circumstances, the judge in an action seeking damages and injunctive relief for wrongful appropriation of a corporate opportunity was warranted in finding that certain statements made by the individual defendants to the plaintiff did not amount to a clear repudiation of the plaintiff's claim and that consequently the action was not barred by the statute of limitations. [284-285]

On appeal from a judgment in a civil action, this court did not accept the defendants' suggestion that less weight and credence should be given to the trial judge's findings because they were in the form of findings proposed by the plaintiff, where the defendants had also been given an opportunity to submit proposed findings and had seen a copy of the findings proposed by the plaintiff before the judge issued his findings and order for judgment, and where the judge's findings were permissible on the evidence. [285-286]

At the trial of an action against two corporations and their majority stockholders, the judge did not err in admitting in evidence Federal tax returns of one of the corporations in view of the plaintiff's need to show in simple form the relationship among certain corporations. [286-287]

---

[1] Junior Sales Club of America, Inc., and Sales Leadership Club, Inc.

Where the judge in a civil action awarded attorney's fees to the plaintiff to be paid by the defendants and it appeared that in making the award the judge gave essentially conclusive weight to a contingent fee arrangement between the plaintiff and his attorney, this court remanded the case for reconsideration of the amount of attorney's fees to be awarded. [287-289]

BILL IN EQUITY filed in the Superior Court on July 3, 1967.

The suit was heard by *Simons, J.*

*Gerald R. Hegarty* for the defendants.

*Frederick S. Pillsbury* for the plaintiff.

CUTTER, J. This equity proceeding, initiated on July 3, 1967, by a minority stockholder of Junior Sales Club of America, Inc. (Junior Sales), sought damages from, and injunctive relief against, the defendants for alleged wrongful appropriation of a corporate opportunity of Junior Sales. Judgment was entered for the plaintiff. The defendants have appealed. The evidence is before us.

A family partnership manufactured and sold greeting cards, most recently in Springfield. In 1953, it was incorporated under the name of Sunshine Art Studios, Inc. (Sunshine). Of the shares, Willard S. Robbins held fifty percent, his wife, Grace B. Robbins, ten percent, and their son, Ryland E. Robbins, forty percent. The real estate used by the corporation was held by a related corporation, Sunshine Realty Corp. Various other corporations, not directly involved in this case, were formed from time to time to conduct particular aspects of the Robbins family greeting card enterprise.

The plaintiff (O'Hara) was a friend and college classmate of Ryland Robbins and had been office manager of Sunshine and its partnership predecessor. He was in charge of promotional work for Sunshine and of developing and testing ideas for the sale of greeting cards.

In 1954, he suggested and carried out a novel method of promoting greeting card sales through prize and money incentives to young people to sell boxed assortments of Sunshine cards. This was initiated under the name of Junior

Sales Club of America, an "oral partnership" in which O'Hara was declared to be a twenty percent partner. This business (Junior Sales) was incorporated in 1955, after a satisfactory experimental period. O'Hara, "several months after the incorporation," received a certificate for twenty shares. The other shares were owned, forty by Willard Robbins and forty by Ryland Robbins. O'Hara never invested directly any money in any of the Robbins greeting card enterprises and, until the incorporation of Junior Sales, was a full-time paid employee of Sunshine which financed the testing of his idea. Ryland Robbins testified that, prior to the incorporation of Junior Sales, O'Hara was told that he would be given twenty percent of the shares of the new corporation. This was something for which O'Hara never asked or negotiated and, according to Ryland Robbins, was given because of "long friendship" and O'Hara's "work on the program."

After the incorporation of Junior Sales, O'Hara became its president and worked for and was paid by both Sunshine and Junior Sales until 1957. Then his duties became concerned almost entirely with Junior Sales. His salary was paid thereafter by Junior Sales in an amount originally intended, at least in a general way, to reflect about twenty percent of the profits of Junior Sales.

In 1956, O'Hara suggested, and developed in large measure, a program conducted under the name "Sales Leadership Club" to promote the sale of imprinted Christmas cards and other greeting cards. This involved some variation of the same marketing plan used by Junior Sales and had greater advantages both for the young distributors and for the sponsors of the program. It used in part the same customers lists and also some rented lists. An initial test period by a partnership was undertaken before this operation also was incorporated in 1958 as Sales Leadership Club, Inc. (Sales Leadership). The partnership filed a partnership tax return for the test period showing as equal partners only Willard and Ryland Robbins. O'Hara received no income from that partnership. Ryland Robbins

could not recall whether O'Hara was told in advance that Sales Leadership Club was to be incorporated. In any event, O'Hara became an incorporator of Sales Leadership and was shown on certificates of condition as having subscribed to one share of its stock.

O'Hara became president of Sales Leadership when it was formed with the same officers, directors, incorporators, and corporate purposes as Junior Sales. It used many of the same methods of marketing and the two corporations were competing in the same market. O'Hara never paid even for the one share of Sales Leadership for which he subscribed.

O'Hara testified that he regarded Sales Leadership as an "outgrowth" of Junior Sales. He, however, never claimed in writing prior to 1966 that he was entitled to any shares or a share of Sales Leadership. In 1966, he requested one-third of its stock on the basis of the articles of organization. The request was refused. O'Hara conceded that neither Willard nor Ryland Robbins ever had told him that he would receive such shares. Ryland Robbins's testimony was that O'Hara was first told in 1959 he had no stock interest in Sales Leadership. O'Hara alleged in his bill and testified that he was told in January, 1962, that "he had no stock ownership in Sales Leadership." He claimed, however, that he "was not told that . . . [he] wouldn't receive any stock" and at that time "believed . . . [he] should be issued some stock." Between 1962 and 1966, O'Hara did nothing to assert his ownership claim, except possibly to ask about it.

From 1958 to 1964, O'Hara was paid what the management had agreed to pay him for those years. During part of those years there was discussion about O'Hara's salary, and testimony indicated that, at least in 1961 and 1962, he was given a percentage (over a base volume) of the profits of Sales Leadership. There was testimony also that at one time O'Hara had overdrawn his share of Junior Sales profits. In 1962, O'Hara and Ryland Robbins had a discussion in which O'Hara was told that the payments to him based upon a percentage of sales were to be discontinued. O'Hara testified that he then resigned from the corporations but

that, upon reconsideration, a compromise was effected. His prior salary was reestablished and his paid vacation time was increased.

There was substantial evidence that payments were made from Junior Sales accounts which more appropriately might have been paid by Sales Leadership. For example, Willard and Ryland Robbins received a salary from Junior Sales every year but in only two years received salaries from Sales Leadership. Junior Sales funds were used, at least to some extent, to pay expenses and salaries for Sales Leadership.

O'Hara, as time went on, assumed other responsibilities in the Robbins family enterprises. By 1965, Ryland Robbins had moved to Arizona, and O'Hara was appointed by Willard Robbins to be general manager of Sunshine. He thus became, in effect, for a time "boss of the whole Sunshine . . . operation." Because Willard Robbins failed to support him in a dispute with the manager of Sunshine's East Longmeadow manufacturing plant, O'Hara left (or was discharged from) his positions with the Robbins companies.

The evidence would have permitted finding the facts stated above. Further facts are stated below in discussing the several issues which the parties have argued.

1. On the evidence, the trial judge concluded in effect that the Sales Leadership operation was a corporate opportunity which could and should have been exploited by Junior Sales. He stated that it was the duty of the individual defendants as officers and directors of Junior Sales "to promote the business of Junior Sales and not to divert that business to another corporation." With the pattern (already mentioned) of a separate corporation for carrying out each aspect of the Robbins family greeting card business, the corporate opportunity perhaps reasonably might have been viewed by the judge as that of Sunshine. On the somewhat conflicting and largely oral evidence, however, we cannot say that the judge's conclusion was clearly erroneous. The Massachusetts cases on the diversion of a corporate opportunity have been collected very recently in

*BBF, Inc.* v. *Germanium Power Devices Corp., ante* 166, 172 (1982).

2. The judge concluded that O'Hara's claim was not barred by the then prevailing torts two-year statute of limitations. See G. L. c. 260, § 2A, as in effect prior to St. 1973, c. 777, § 1. He found that O'Hara was not told until early 1966 (when O'Hara and Willard Robbins corresponded about a possible purchase of O'Hara's shares in Junior Sales) that "he would receive no stock ownership in Sales Leadership or any interest in Sales Leadership by virtue of his stock ownership in Junior Sales." The judge had found earlier that, in discussions in 1962, O'Hara had been "told that he had no stock in Sales Leadership." The judge decided, however, that because of the "close personal relationship between O'Hara" and the Robbinses, father and son, O'Hara had every reason to believe that he would be treated fairly as an "employee and as a minority stockholder in Junior Sales." O'Hara, of course, "knew that Sales Leadership had been incorporated to carry on . . . business in . . . competition with Junior Sales, [but] he had no reason to complain" which would "require him to . . . take legal action." He had received until 1962 compensation based in part upon Sales Leadership's sales and no shares in Sales Leadership were issued to any shareholder until 1966. Thus the correspondence in 1966, after he had left the Robbins companies, constituted the earliest repudiation of his claim which required "him as an officer and director of Junior Sales to complain about the diversion of its profits."

Upon the somewhat confused and conflicting testimony, the trial judge was justified in determining that the statements to O'Hara in 1959 and 1962 that he had no stock in Sales Leadership did not amount to a clear repudiation by either Robbins of their fiduciary duty at least to insure that profits were allocated fairly between Junior Sales and Sales Leadership. This could be determined to be the situation even if the Robbinses were unwilling in 1959 and 1962 to recognize O'Hara's claim to twenty percent of Sales Leadership's shares. This litigation was commenced within two

years after the date on which (as the judge thus reasonably found) one of the quasi trustees for the first time had repudiated at least some aspects of their fiduciary duty in the 1966 correspondence. Thus the bill is not barred by the statute of limitations or laches. See *Akin* v. *Warner*, 318 Mass. 669, 676 (1945), and cases cited; *Kearney* v. *Mechanics Natl. Bank*, 343 Mass. 699, 702-703 (1962); *Hendrickson* v. *Sears*, 365 Mass. 83, 88-91 (1974); *Franklin* v. *Albert*, 381 Mass. 611, 613-620 (1980), and cases cited. See also *Samia* v. *Central Oil Co.*, 339 Mass. 101, 112-113 (1959). Compare *Burns* v. *Massachusetts Inst. of Technology*, 394 F.2d 416, 419-420 (1st Cir. 1968); Restatement (Second) of Trusts § 219 (1959); 3 Scott, Trusts § 219.2, at 1761 (3d ed. 1967).

3. We are urged by the defendants to afford to the trial judge's findings less weight and credence because they, to a considerable extent, were precisely in the form of findings proposed by O'Hara's counsel. See *Cormier* v. *Carty*, 381 Mass. 234, 235-238 (1980). The docket and transcript indicate that trial began on July 5, 1978, and ended on July 11, 1978. At the conclusion of arguments, the trial judge requested counsel to confer in chambers with him about "the possible submission of some memoranda." There is in the record no transcript of this conference. The defendants' counsel by affidavit (reproduced in the record) asserts that he received from O'Hara's attorney a copy of proposed findings, rulings, and an order for judgment on August 5, 1978, with a copy of a letter to the clerk's office from the attorney referring to "the brief . . . which [the trial judge] . . . instructed" him "to mail to you." We thus assume that counsel decided to submit as his trial brief the findings which he proposed that the judge make. Whether the defendants similarly submitted proposed findings as their brief is not shown in the record. It is not argued that the defendants were not given the opportunity to do so and their attorney's affidavit shows that they certainly knew by early August, 1978, what O'Hara's counsel had done.

The judge did not issue his findings, rulings, and order for judgment until August 18, 1980, more than two years after

the close of the trial.  It thus was unlike either *United States* v. *El Paso Gas Co.*, 376 U.S. 651, 656-657 (1964), or the *Cormier* case, 381 Mass. at 235 nn.1 and 2, and 237 n.5, where it appears that the probate judge, whose action was reviewed in that case, had not requested from prevailing counsel (with a copy of the request sent to adversary counsel) suggestions for findings until after she had reached her decision.  The trial judge in 1980 in the present case made only minor changes, largely in the omission of case citations, in the findings proposed in 1978 by O'Hara's counsel.  In the light of the *Cormier* decision (because there is not any clear indication in the record of the extent to which the findings are the product of the trial judge's independent judgment), careful scrutiny of the trial judge's findings and conclusions has been given, although this may have been unnecessary in view of n.5 in the *Cormier* case, *supra* at 237.  We are satisfied that, upon the evidence, and on not unduly complicated issues, his findings were permissible. They certainly do not leave us "with the definite and firm conviction that a[ny] mistake has been committed." *Marlow* v. *New Bedford*, 369 Mass. 501, 508 (1976), quoting *United States* v. *United States Gypsum Co.*, 333 U.S. 364, 395 (1948).  See also *Markell* v. *Sidney B. Pfeifer Foundation, Inc.*, 9 Mass. App. Ct. 412, 414-418, 431-432 (1980).

4.  The defendants contend that the trial judge improperly permitted copies of Sales Leadership's tax returns to be admitted as exhibits "for the purposes of showing any transactions between . . . [Sales Leadership] and . . . Junior Sales . . . and . . . Sunshine . . . [and] any other relevant association or interest."  In *Town Taxi, Inc.* v. *Police Commr. of Boston*, 377 Mass. 576, 586-588 (1979), it was decided (with full examination of the pertinent authorities) that corporate Federal tax returns have only "a qualified right to confidentiality."  We cannot say the trial judge erred in his appraisal of the conflicting policies[2] on the use

---

[2] See discussion of the policies concerning the use in evidence of copies of Federal income tax returns in *Heathman* v. *United States Dist. Court*, 503

of tax returns by admitting the returns in evidence, in view of O'Hara's need to show in simple form the general business and fiscal relationships among the corporations.

5. The trial judge accepted the proposal of O'Hara's counsel that the defendants be allowed to select one of three alternative forms of relief viz., (1) that Sales Leadership transfer all its assets to Junior Sales, or (2) that all the shares of Sales Leadership be transferred to Junior Sales, or (3) that twenty shares of Sales Leadership be transferred to O'Hara. The parties, after the trial judge made his order for judgment, stipulated that the defendants (without waiving their rights of appeal) would accept the third alternative but would reduce to ten the number of shares of Sales Leadership to be transferred to O'Hara. This was done because, prior to the judge's order, half the shares of Sales Leadership had been redeemed. Judgment was entered in accordance with the stipulation for the transfer to O'Hara of ten shares of Sales Leadership. This had the result of transferring to O'Hara a twenty percent minority interest in assets having a 1976 book value of about $2,115,000, or an interest worth somewhat over $420,000.

6. Before the trial judge, O'Hara's attorney stated by affidavit and testimony (based upon such time records as he had kept) that he had expended about 183½ hours on the case. On the basis of the contingent fee arrangement which the attorney had made with O'Hara, that would have entitled the attorney to a fee of about $62,215, which is what the trial judge allowed as the fee to be paid by Junior Sales.

Where attorneys' fees are to be paid out of a fund or on a basis other than the usual rule that each litigant must bear his own expenses (see *Creed* v. *Apog*, 377 Mass. 522, 525 [1979]), the traditional Massachusetts principle was stated

F.2d 1032, 1033-1035 (9th Cir. 1974); *Premium Serv. Corp.* v. *Sperry & Hutchinson Co.*, 511 F. 2d 225, 229 (9th Cir. 1975); *Tollefsen* v. *Phillips*, 16 F.R.D. 348 (D. Mass. 1954); *Mitsui & Co.* v. *Puerto Rico Water Resources Authy.*, 79 F.R.D. 72, 80-81 (D.P.R. 1978). See also *St. Regis Paper Co.* v. *United States*, 368 U.S. 208, 215-219 (1961); Liacos, Massachusetts Evidence 193, 199 (5th ed. 1981).

in *Hayden* v. *Hayden*, 326 Mass. 587, 595-596 (1950), "Where payments are to be made out of the property of litigants to or for the benefit of counsel who may not have been employed by those whose estates are thus diminished, the standard is not the same as that applied in an action by an attorney against a client with whom he has voluntary contractual relations . . . . Fees in . . . [cases of the former type] are awarded on 'strictly conservative principles.'" See *Holyoke Natl. Bank* v. *Wilson*, 350 Mass. 223, 230 (1966). The *Hayden* case (at 596) refers to a possible test of "the compensation paid to public officers for services of a similar character," perhaps by itself too parsimonious a standard for application in an inflationary period. See discussion in *First Natl. Bank* v. *Brink*, 372 Mass. 257, 265-266 (1977). See also *Linthicum* v. *Archambault*, 379 Mass. 381, 388-389 (1979). Compare, however, *Madden* v. *Madden*, 363 Mass. 884 (1973).

The Federal courts have held that contingent fee agreements should not be considered in fixing attorneys' fees in cases much like that before us. See *Hew Corp.* v. *Tandy Corp.*, 480 F. Supp. 758, 761-763 (D. Mass. 1979), where the authorities were reviewed carefully and the appropriate criteria were stated in detail. There is further discussion of relevant considerations in *Farmington Dowel Prod. Co.* v. *Forster Mfg. Co.*, 421 F.2d 61, 86-92 (1st Cir.),[3] appeal of decision on remand, 436 F.2d 699 (1st Cir. 1970). Compare *Souza* v. *Southworth*, 564 F.2d 609, 612-614 (1st Cir. 1977).

We recognize that O'Hara's counsel is a lawyer of skill, experience, and standing in his community who has achieved for his client a highly satisfactory result. Taking into account, however, all aspects of this case of which we are

[3] It will be observed that (at 90) the First Circuit notes (in a Clayton Act case) that a contingent fee arrangement may be taken into account for purposes of determining what fee is reasonable under the Canons of Ethics, but not for purposes of determining what is "reasonable" under § 4 of the Clayton Act. See for reasonableness of a fee under the Canons of Ethics, *First Natl. Bank* v. *Brink*, 372 Mass. at 263-268, but see dissent at 268-270.

aware, we are left with the conviction that the fee allowed as to be paid by Junior Sales is somewhat excessive, perhaps because the trial judge gave, despite the decisions already cited, essentially conclusive weight to the contingent fee arrangement[4] between O'Hara and his attorney and insufficient weight to other factors, such as time reasonably expended and absence of great complexity of the facts, which were deserving of consideration under the pertinent case. Accordingly, we remand the case to the Superior Court for reconsideration and a new exercise by the trial judge of his discretion to fix the amount to be paid to O'Hara's attorney by Junior Sales,[5] this to be done in accordance with the criteria referred to in this opinion and in the decisions herein cited. In other respects, the judgment is affirmed.

*So ordered.*

---

[4] We note with approval that the contingent fee arrangement conforms to the suggestion in S.J.C. Rule 3:05, as appearing in 382 Mass. 763, 765 (1981), that a contingent fee may be "in a descending scale in relation to amount collected."

[5] We do not suggest that O'Hara's attorney may not recover from O'Hara any balance of the contingent fee agreed to above the amount to be ordered paid by Junior Sales.