Jon SUGARMAN, et al.,
Plaintiffs, Appellees,

v.

Leonard SUGARMAN and Statler
Industries, Inc., Defendants,
Appellants.

No. 85–1612.

United States Court of Appeals,
First Circuit.

Argued Feb. 4, 1986.

Decided June 30, 1986.

David G. Hanrahan with whom Arthur M. Gilman, David L. Klebanoff and Gilman, McLaughlin & Hanrahan, Boston, Mass., were on brief, for defendants, appellants.

Thomas V. Urmy, Jr. with whom Charles M. Trippe, Jr., Janice Kelley Rowan and Warner & Stackpole, Boston, Mass., were on brief, for plaintiffs, appellees.

Before COFFIN and BOWNES, Circuit Judges, and PETTINE,* Senior District Judge.

COFFIN, Circuit Judge.

Leonard Sugarman appeals from a judgment of the United States District Court for the District of Massachusetts, based on a finding that he breached his fiduciary duty to minority shareholders in a close corporation. We conclude that none of the various errors of fact or law alleged by appellant warrant reversal of the district court's judgment as to liability. Because, however, of our differences with the district court as to the appropriate Massachusetts statute governing interest and the allowability of attorney's fees, we must remand for a recalculation of appellees' award, increasing the amount attributable to interest and deleting the amount attributable to attorney's fees.

I. *Factual Background*

In 1906, four brothers formed a partnership, Sugarman Brothers, for the purpose of selling paper products. By 1918, the partnership was owned in equal shares and managed by three of the four brothers: Joseph, Samuel and Myer Sugarman. Leonard Sugarman ("Leonard"), defendant-appellant, is the son of Myer, who died in 1983. Plaintiffs-appellees are the grandchildren of Samuel, who died in 1965.

In the 1930's, the principals in Sugarman Brothers organized Leonard Tissue Corpo-

---

* Of the District of Rhode Island, sitting by desig- nation.

ration, owned equally by Joseph, Myer and Samuel. Following World War II, Sugarman Brothers was incorporated, with its stock also owned equally by the three Sugarman branches. In 1964, Leonard Tissue changed its name to Statler Tissue and in 1969, Statler Tissue and Sugarman Brothers merged to create Statler Corporation. Statler's common stock was owned in approximately equal amounts by each of the three Sugarman branches. Leonard, his father Myer, and appellees' father, Hyman, were all officers and directors of the company.

The present difficulties arise from the fact that, after the original equal division which existed until 1974, one branch of the family has controlled a majority of the stock and all of the management. Defendant Leonard Sugarman, president of the company and chairman of the board, owns 61% of the stock; plaintiffs Jon Sugarman, James Sugarman, and Marjorie Sugarman Tyie, Hyman's children, own 21.78%. These disparate holdings result from the fact that Samuel gave some of his stock to his son Hyman, and some to Jon, James and Marjorie, Hyman's children. Hyman, in turn, sold his shares to Leonard in 1974. The stock owned by Joseph Sugarman was ultimately redeemed, and while this did not vary the relative proportion of the stock owned by Leonard vis-a-vis the plaintiffs, it did result in Leonard owning over half of the outstanding shares. When Leonard purchased Hyman's shares in the spring of 1974, Leonard and his immediate family owned 49.6% of the company's outstanding stock. Harris Baseman, the company's lawyer, owned approximately .8%. Because Baseman owed his appointment as company counsel to Leonard, and was Leonard's personal counsel, Leonard effectively controlled the company from that time forward.

Members of the other branches of the family were employed by the company from time to time. The district court found that James Sugarman had never sought to be employed by the company, and that Marjorie Sugarman had sought to be employed, but was not. The court stated that

Jon Sugarman was employed from 1974 until his discharge in 1978, but did not rule on whether that discharge was improper, as alleged by Jon.

In 1981, plaintiff-appellees brought suit, alleging that Leonard had abused his fiduciary duty to Statler and to appellees. Count I of the complaint sought a derivative recovery against Leonard on behalf of Statler, alleging that Leonard had caused Statler to pay him excessive salary and bonuses and had engaged in other forms of prohibited self-dealing. Count II sought direct recovery for appellees against Leonard on the theory of "freeze-out" of minority shareholders. This theory was based on allegations that Leonard had deprived Jon and Marjorie Sugarman of desired employment with the company, had drained off the company's earnings in the form of excessive compensation to Leonard, and had refused to pay dividends.

The district court found that Leonard had given his father, Myer, salary and pension benefits that were not given equally to Hyman, appellees' father. In addition, it found that Leonard had offered to buy Jon and Marjorie's stock at a grossly inadequate price. The court also found that Leonard had received excessive compensation from Statler for the years 1978 to 1984 and that this overcompensation "was effected in bad faith, as part of an attempt to freeze out minority interests". The court concluded that this combination of factors was proof of Leonard's effort to improperly freeze appellees out of the company. Adding annual interest at twelve percent from the dates each of these payments were made, the court concluded that a total amount of $1,353,837 had been improperly paid to Leonard and Myer. The court further found that Leonard had improperly caused Statler to pay on his behalf an additional $82,201 in attorney's fees and $9,836 in expert witness fees in defending this action. The court then awarded damages directly to appellees in an amount equal to 21.78% of these improper payments, a percentage equivalent to the amount of stock owned by appellees. The

court also awarded appellees their attorney's fees and costs in the amount of $115,-720. The final amount awarded to appellees was $537,925.

## II. *Freeze-Out*

We first examine the legal standard that must be met to establish a "freeze-out" of minority shareholders, and then analyze the evidence and findings of the district court. In *Donahue v. Rodd Electrotype Co. of New England,* 367 Mass. 578, 328 N.E.2d 505 (1975), the Massachusetts Supreme Judicial Court (SJC) held that shareholders in a close corporation owe one another a fiduciary duty of " 'utmost good faith and loyalty' ". 367 Mass. at 593, 328 N.E.2d 505 (quoting *Cardullo v. Landau,* 329 Mass. 5, 8, 105 N.E.2d 843 (1952)). According to the court, stockholders in a close corporation "may not act out of avarice, expediency or self-interest in derogation of their duty of loyalty to the other stockholders and to the corporation." *Id.*

The court's decision in *Donahue* was premised on the rationale that the corporate form of a close corporation "supplies an opportunity for the majority stockholders to oppress or disadvantage minority stockholders". *Id.* 367 Mass. at 588, 328 N.E.2d 505. Some of these devices to "freeze out" the minority were described by the court:

" 'The squeezers [those who employ the freeze-out technique] may refuse to declare dividends; they may drain off the corporation's earnings in the form of exorbitant salaries, and bonuses to the majority shareholder-officers and perhaps to their relatives ...; they may deprive minority shareholders of corporate offices and of employment by the company; they may cause the corporation to sell its assets at an inadequate price to the majority shareholders.' " *Id.* at 588–89, 328 N.E.2d 505, (quoting F.H. O'Neal and J. Derwin, *Expulsion or Oppression of Business Associates: "Squeeze-Outs" in Small Enterprises* 42 (1961)).

All of these devices are designed to ensure that the minority shareholders do not receive any financial benefits from the corporation. When these types of "freeze-outs" are attempted by the majority, "the minority stockholders, cut off from all corporation-related revenues, must either suffer their losses or seek a buyer for their shares". 367 Mass. at 590–91, 328 N.E.2d 505. This, according to the court, is often "the capstone of the majority plan". Because minority shareholders cannot sell their stock on the open market, as can shareholders in public corporations, the minority shareholders may be compelled to deal with the majority and be vulnerable to low offers for their stock. *Id.* at 592, 328 N.E.2d 505. As the court explained, "[w]hen the minority stockholder agrees to sell out at less than fair value, the majority has won." *Id.*

In *Wilkes v. Springside Nursing Home, Inc.,* 370 Mass. 842, 353 N.E.2d 657 (1976), the SJC held that three directors of a close corporation had improperly "frozen-out" Wilkes, a fourth director when they removed him from the payroll without any "legitimate business interest". 370 Mass. at 852, 353 N.E.2d 657. The court also stated that it could "infer that a design to pressure Wilkes into selling his shares to the corporation at a price below their value well may have been at the heart of the majority's plan." *Id.* This inference arose from the fact that "Connor [one of the stockholders], acting on behalf of the three controlling stockholders, offered to purchase Wilkes's shares for a price Connor admittedly would not have accepted for his own shares." *Id.* at 852, n. 14, 353 N.E.2d 657.

In these cases, the SJC has pioneered in developing an effective cause of action for minority shareholders who have been denied their fair share of benefits in close corporations. At the same time, it has carefully set out the contours of that cause of action. First, it is not sufficient for a minority shareholder to prove that the majority shareholder has taken excessive compensation or other payments from the corporation. *See Bessette v. Bessette,* 385 Mass. 806, 809–10 & n. 5, 434 N.E.2d 206

(1982) (right to recover overcompensation payments belongs to the corporation as a whole; suit must be brought as derivative action unless plaintiffs specifically allege that "defendant's conduct was an attempted 'freeze-out' of the minority stockholders by draining off 'the corporation's earnings in the form of exorbitant salaries and bonuses.' ") (quoting *Donahue*, 367 Mass. at 588–89, 328 N.E.2d 505). Here, appellees alleged a freeze-out attempt, and the district court found that Leonard's overcompensation was indeed "effected in bad faith, as part of an attempt to freeze out minority interests".

Second, it is not sufficient to allege that the majority shareholder has offered to buy the stock of a minority shareholder at an inadequate price. Majority shareholders have an independent duty to exercise complete candor with minority shareholders when they negotiate stock transactions; they must fully disclose all the material facts and circumstances surrounding or affecting a proposed transaction. *Lynch v. Vickers Energy Corporation*, 383 A.2d 278, 279 (Del.Sup.1977) (failure to disclose material facts in a tender offer); *Ritchie v. McGrath*, 1 Kan.App.2d 481, 571 P.2d 17, 22 (1977) (same); *Flynn v. Bass Brothers Enterprises*, 456 F.Supp. 484, 493 (E.D.Pa. 1978) (must prove at trial that material information was withheld in tender offer). If a majority shareholder breaches this duty, and a minority shareholder sells stock at an inadequate price, the minority shareholder can seek damages based on the difference between the offered price and the fair value of the stock. *See, e.g., Lynch*, 383 A.2d at 278–79.

In most cases, a stockholder must first sell his or her stock at an inadequate price before seeking damages. In a close corporation, however, a minority shareholder who merely receives an offer from a majority shareholder to sell stock at an inadequate price, but does not accept that offer, can still seek damages *if* the shareholder can prove that the offer was part of a plan to freeze the minority shareholder out of the corporation. That is, the minority shareholder must first establish that the majority shareholder employed various devices to ensure that the minority shareholder is frozen out of any financial benefits from the corporation through such means as the receipt of dividends or employment, and that the offer to buy stock at a low price is the "capstone of the majority plan" to freeze-out the minority. *Donahue*, 367 Mass. at 592, 328 N.E.2d 505.

The necessary ingredients of a freeze-out of minority shareholders are present in this case. The district court first had to find that Leonard Sugarman took actions to ensure that appellees would not receive any financial benefits from Statler. As noted, the court did find that Leonard's overcompensation was designed to freeze-out appellees from the company's benefits. The court also took note of the fact that dividends had never been paid by the company, although it concluded that dividends were only indirectly the issue in this case.[1] The court also pointed out that Marjorie had sought and been denied employment with Statler and that Jon had alleged he was improperly discharged from employment at Statler. The court concluded, however, that it did not need to pass on this "doubtful proof" concerning employment in order to find freeze-out of the minority shareholders.

We agree that the district court was not required to find that every possible device for effectuating a freeze-out was employed by Leonard. Rather, the finding that was essential, and that was made by the district court, was that Leonard took some actions that were designed to freeze appellees out of the financial benefits they would ordinarily have received from Statler. Once the court made that finding, it could appropriately conclude that Leonard's offer to buy Jon and Marjorie's stock at an inadequate price was the capstone of

---

1. The district court referred to the statement made by the SJC in *Donahue*, 367 Mass. at 592, 328 N.E.2d 505, that "[m]ajority 'freeze-out' schemes which withhold dividends are designed to compel the minority to relinquish stock at inadequate prices."

a plan to freeze out appellees. *See Donahue*, 367 Mass. at 592, 328 N.E.2d 505.

III. *Payments to Myer*

As one of the factors establishing freeze-out, the district court found that Myer, Leonard's father, had received salary and pension benefits in excess of payments made to Hyman, appellees' father. Myer was one of the founding members of the company. From 1975–81, from ages 82–88, Myer received substantial salaries from Statler. In the last two years of his employment, 1980–81, Myer's salary approximately doubled, reaching $85,000. On his retirement in 1982 at age 88, Myer was voted a pension of $75,000. Hyman, while employed by Statler, received a salary similar to Myer's pre–1980 salary. When Hyman's employment with Statler ended in 1980, however, he was not voted a similar pension payment.

Although the district court found that "soon after 1975 [Myer's] net value to the company declined from relatively little to zero", it went on to conclude that it did "not quarrel seriously with payments to Myer and Hyman, whether for working, or as a pension, as long as neither is favored." Appellants argue that the court made two factual mistakes in its analysis of the payments to Myer and Hyman which require reversal. We find neither of these claims to have merit.

■ Appellants first note that the court erred when it stated that Hyman died in 1979 and that no pension was voted to his estate. It is true, as appellants point out, that Hyman did not die in 1979, but rather left the company's employ in 1980. Nevertheless, we believe this misstatement on the part of the court to be harmless. If what was improper was the differential treatment between Myer and Hyman, it makes no difference whether the money under consideration was paid to the person himself as a pension or to the person's estate. We believe the district court made

the same assumption. At a post-trial hearing on attorney's fees, the court was informed by the parties that, in fact, Hyman was still alive. The court apparently did not believe that fact ultimately changed its analysis, and we agree.

■ Appellants' second argument is that Hyman and Myer were disparately situated within the company, and that the district court failed to explain why differential treatment of the two was inherently wrong. They point out that Myer was an original founder of the corporation, a stockholder, and had remained in the company's employ until his retirement. In contrast, they note that Hyman was only a son of one of the founders, had not been a stockholder since 1974, and had his employment with the company come to an end in 1980. We believe the district court sufficiently explained its reasoning and was correct in its conclusion based on the evidence. The court noted that Myer's salary was suddenly doubled in 1980, with no evidence that Myer was more valuable than Hyman at that point. The court also stated that this salary, for a person who had "become completely irresponsible,[2] unless possibly viewed as a pension, was blatantly unconscionable". In viewing it as a pension, similar to the $75,000 actually voted to Myer as a pension in 1982, the court noted that Hyman received no such comparable pension benefits. Even if Hyman and Myer were not identically situated within the company, their situations were not so disparate as to preclude the court's finding that the payments to Myer were "a shocking case of special treatment for the majority stockholder's side of the family".

IV. *The Stock Offer*

■ As the second factor establishing freeze-out, the district court found that Leonard had offered to buy Jon and Marjorie's stock at a "grossly inadequate price". We have already concluded that such an

---

**2.** The evidence was that Myer had ceased to function effectively as a corporate executive, i.e., that he frequently did not know where he was and what he was doing. Myer was diagnosed as having Alzheimer's Disease.

offer may be viewed as an important component of a freeze-out plan. Appellants argue, however, that the district court made a factual error in its analysis of the stock offer that requires reversal. We do not agree.

The district court found that Leonard had offered to buy Jon and Marjorie's stock in 1980 for $3.33/share. It also found that, in 1980, the company's accountants, Price Waterhouse, had informed Leonard that the book value of the company's stock was $16.30 a share. The court had to decide whether book value of shares in a close corporation could be considered fair value of the stock. The court noted that it "might have considered that book value is not fair value for shares in a close corporation, but Price Waterhouse set this price for purchases by 'key management personnel' pursuant to the company's stock option plan."

Appellants point out that this comment is a misstatement of fact, because the stock option plan to which the court referred had expired the previous year and the letter from Price Waterhouse had made no mention of the stock option plan. Even if the court's comment reflected a misapprehension of fact [3], we do not believe this possible misapprehension undermines the basic validity of the court's analysis. The stock option plan was critical for determining whether the book value of the stock, as established by Price Waterhouse in 1980, was to be considered fair value of the stock, and thus whether Leonard's offer of $3.33 to Jon and Marjorie should be viewed as unreasonably low. In the stock option plan, adopted in 1972 and in existence till 1979, the company had stated that because the shares of the company "have no recognized market, are not traded regularly or irregularly by any persons and have not been subject to valuation by any disinterested party," the "book value of the shares" would be considered a fair measure of the stock's value. As stated in the plan: "The book value per share shall be that amount as determined by the independent auditors of the Company at the close of the most recently completed fiscal year. Such book value shall be the fair market value for the purposes of this Plan."

Given the framework of the stock option plan, the district court could legitimately conclude that Leonard's offer of $3.33 to Jon and Marjorie in 1980 was unreasonably low. The fact that the court may have been wrong on a subsidiary factual point regarding the term of the stock option plan does not undermine the validity of the court's essential finding regarding Leonard's offer.

## V. *Leonard's Compensation*

Appellants argue that the district court made a number of errors of fact and law in analyzing Leonard's compensation. We do not believe that any of the alleged errors warrant reversal of the court's findings.

■ Appellants first argue that the court's determination that Leonard's salary was unreasonable was tainted by its erroneous findings of bad faith and freeze-out, and that a new trial on the compensation issue is warranted. We do not agree. The court stated that "[i]t *may* also be appropriate to consider Leonard's bad faith in connection with the amount of his compensation. Certainly, at the least, it prevents giving weight to the judgment of a board of directors that he controlled" (emphasis added). We find no error in this statement. While courts often defer to the business judgments of boards of directors in ordinary situations, there is nothing improper in reducing the level of that deference once a court has determined that the director who controls the board has operated in bad faith.

■ Appellants next point to a series of errors in the court's calculation of Leonard's compensation. We deal with these seriatim. First, appellants argue that the court erred in comparing Leonard's compensation to that of similarly situated com-

---

**3.** We point out that "pursuant" may have been used by the district court merely in the sense of "consistent with the technique that had been agreed on."

pany directors when it looked only at Leonard's cash compensation and failed to take into account the non-cash elements of compensation packages often given to other company directors. We do not believe the court erred. The question of what elements in the package should have been considered in analyzing Leonard's compensation was extensively addressed and debated by the expert witnesses for each side. Both witnesses agreed that they had not taken into account the company's pension plan in their analyses, and thus the disputed question revolved around whether other long-term incentive plans, such as stock options, should be included in the comparision. Donald Simpson, appellees' expert witness, testified that he did not include such incentive plans in his analysis because such plans were not common in small companies like Statler, and because his experience was that when an officer already has a major ownership in the company (such as Leonard's 60% ownership), the officer does not participate in long-term incentive plans. Clifford Mitman, Leonard's expert witness, disagreed, stating that he considered Leonard's 60% ownership to be irrelevant in doing a comparative analysis. Faced with this conflicting expert testimony, the district court chose to accept Simpson's testimony, concluding that Leonard's 60% ownership was relevant and that Leonard's compensation was therefore significantly greater than that of other comparable officers. We find that the court was clearly within its discretion in accepting Simpson's testimony.

■ Second, appellants argue that the court erred in not giving weight to Internal Revenue Service (IRS) audits that found Leonard's compensation to be unreasonable during only two years. We do not agree that the court committed error when it failed to give the IRS audits "any favorable weight". Results of IRS audits may be considered by the trial court in its discretion, but are not conclusive on the reasonableness of salaries. *Miller v. Magline Inc.*, 76 Mich.App. 284, 256 N.W.2d 761, 768 (1977). In this case, the district court heard a great deal of evidence from two

expert witnesses on Leonard's compensation and made its factual findings on that basis. In light of this detailed expert testimony, it is understandable that the district court would have felt that the more general IRS audits would not be particularly relevant or helpful. We find no reversible error in the court's approach.

■ Third, appellants argue that the district court did not fully understand the import of Leonard's testimony regarding sales commissions that Leonard could have received instead of salary. We disagree. Leonard testified that, during 1974–1980, he "acted as an agent" for three of the company's major accounts, and that if he had simply received the usual 2.7% sales commission, he would have earned $378,000 per year "without the problems and burdens of being Chief Executive Officer". The court's response was that "[t]here seems something very peculiar about paying a company president a brokerage fee" and that "[i]f a customer is satisfied to stay without constant nursing, that is to the credit of the company's performance. It is not an independent reason to give a continuing bonus to the president." We conclude that the court understood perfectly the import of Leonard's testimony, and acted well within its discretion in refusing to consider such potential commissions.

■ Fourth, appellants argue that the district court failed to consider the impact of the bonus plan which substantially contributed to Leonard's salary from 1976 to 1979. We do not find reversible error in the court's calculations. It is true that Statler's returns on equity in the years 1975–77 were above average, and that Leonard's bonuses during that time may have been justified. The court, however, charged Leonard with overcompensation only for the years 1978–84, and used the salary and bonuses given in 1976 and 1977 only to partly discharge catch-up salary obligations. Further, the court's ultimate conclusion of overcompensation was largely based on the fact that, when the company began doing poorly after 1978, Leon-

ard's bonuses significantly dropped while his salary substantially increased.

■ Fifth, appellants argue that the district court made a significant error of fact when it stated that Leonard's salary comprised a higher percentage of company's sales than had been found legitimate for a company president in *Black v. Parker Manufacturing Co.*, 329 Mass. 105, 115–17, 106 N.E.2d 544 (1952). We do not believe the court's statement constituted reversible error, and indeed, we believe the district court properly applied the basic principle enunciated in *Black*.

In *Black*, the court stated that the salary and bonus of a chief executive officer should be approved if they bear "a reasonable relation to the officer's ability and to the quantity and quality of the services he renders. Responsibilities assumed, difficulties involved and success achieved are matters to be considered." 329 Mass. at 116, 106 N.E.2d 544. In *Black*, the officer's compensation was in the 1%–2% range of the company's net sales; Leonard's percentage ranged between .60% and 1% of sales. The court commented as follows: "Passing the fact here, that Leonard's percentage was higher [than the president in *Black*), his total compensation often bore an inverse relationship to the company's performance. In three out of the last five years the return on equity was poor, and in 1984 negative, the company actually losing money. Yet in that year, by a process of maximum salary and minimum bonus, Leonard received the greatest compensation ever."

It is clear that the precise ratio that Leonard's compensation held to company sales was not the controlling factor in the district court's analysis. Indeed, appellants would have us construe a disclaimed basis for decision ("passing the fact") as an actual basis. Rather, the essential element for the court was the fact that the company was doing quite poorly in 1980–84, Leonard's bonuses thus fell off significantly,

and yet Leonard's salary increased by almost $100,000 each year. Under the principle enunciated in *Black*, it was appropriate for the court to question the reasonableness of Leonard's salary under these circumstances and to accept expert testimony regarding the excessiveness of that salary. The court's miscalculation regarding percentages was harmless.

■ Last, appellants argue that the district court's treatment of Leonard's "catch-up" claim was illusory and arbitrary. Leonard claimed that he was underpaid during the years 1969–1974, a period during which Statler performed well. Leonard argued that any possible overcompensation in his salary in later years was "catch-up" pay for those previous years. The district court accepted the principle that Leonard deserved some catch-up pay, and modified its calculations in light of that principle. Leonard's argument on appeal is that the district court did not give sufficient weight to catch-up pay, and that the modifications the court made were arbitrary.

We disagree, finding that the district court acted within its discretion in making its modifications. The district court was presented with extensive expert testimony on this issue. Plaintiff's expert witness, Simpson, testified that Leonard's salary from 1974–84 was above the average salary for a CEO in a similar type of company. In his analysis, Simpson developed four tables, the highest being for a CEO with stock ownership whose performance was good (Table D). Although Simpson had not taken into account, in his analysis, the fact that Leonard received below average salary for a number of years previous to 1974, he did agree to the principle that a board of directors could increase a CEO's salary for a number of years as "catch-up" pay. Simpson noted, however, that such catch-up pay usually does not go on indefinitely and is dependent on continued good performance. Defendant's expert, by contrast, testified that all of Leonard's higher than usual salaries from 1975 on, including the years in which the company had done very

poorly, were justified on the grounds of catch-up pay.

Based on this conflicting expert testimony, the district court made its own factual conclusions. It accepted Simpson's testimony that catch-up pay should play a role in deciding compensation, albeit not indefinitely, and it made adjustments in Simpson's analysis to reflect that. First, it ignored any overcompensation for the years 1976 and 1977. Second, for the years 1978 and 1979, it accepted Simpson's highest salary figures (for a stock-holding CEO whose performance was good, Table D), and added a supplement of 10% to that table. Third, although the court found that Leonard's claim to Table D faltered by relatively poor performance after 1980, it retained Leonard in that table through 1984 (without the 10% additional) as a carry-over bonus for past accomplishments.

It would have been useful if plaintiff's expert had been informed of Leonard's previous low salary years and had made his own adjustments for catch-up pay. Nevertheless, it would still have been the job of the district court to accept those adjustments or not. We conclude that the court's actions, in making its own adjustments, were within its discretion.

## VI. *Laches*

■■■ The district court applied laches to bar appellees' claims for damages prior to 1978. Appellants argue that laches should bar recovery for all years prior to 1980, the year before the suit was filed. We disagree. The district court appropriately found that Jon Sugarman, having made his complaint about Leonard's salary at the 1978 and 1979 stockholder meetings, was not unjustified in delaying the suit until 1981. As the court noted, "[l]awsuits are expensive, and it was not unreasonable to await further development." In addition, as the court pointed out, Leonard did not change his behavior even after plaintiffs filed suit. Thus, we cannot say that appellees' delay caused Leonard to take steps to

his detriment which he otherwise would not have taken. *See Provident Co-Operative Bank v. James Talcott, Inc.,* 358 Mass. 180, 187, 260 N.E.2d 903 (1970) (to sustain a defense of laches, party must prove that a plaintiff's delay resulted in prejudice or disadvantage to the defendant).

## VII. *Computation of Interest*

In calculating interest on the damage award, the district court applied Mass.G.L. c. 231, § 6C, which provides that in judgments for pecuniary damages in contract actions, interest shall be awarded at a rate of 12% from the date of breach or demand. The court rejected plaintiff-appellees' request that interest be calculated on the basis of Mass.G.L. c. 231, § 6B, which provides that in judgments for pecuniary damages in tort actions, interest at the rate of 12% shall be awarded from the date of commencement of the action. It also rejected defendant-appellant's request that interest be awarded on the basis of Mass. G.L. c. 107, § 3, which provides that if "there is no agreement or provision of law for a different rate", interest shall be calculated at the rate of 6%.

■■■ The district court properly rejected appellant's contention that Mass.G.L. c. 107, § 3 should be applied to this case. *See Perkins School for the Blind v. Rate Setting Commission,* 383 Mass. 825, 835–36, 423 N.E.2d 765 (1981) (Mass.G.L. c. 231 § 6C governs "judgments for pecuniary damages" and thus supercedes Mass.G.L. c. 107 § 3 in situations where judgments have been awarded.) We believe, however, that the proper statute to be applied in this case was the one governing tort actions.

■■■ The district court first stated that, if Leonard's breach of fiduciary duty to appellees was a tort, "it is not of a type described in the statute." Mass.G.L. c. 231 § 6B covers interest to be awarded on judgments for "personal injuries to the plaintiff or for consequential damages, or for damages to property". It is true that a

variety of torts, including breaches of fiduciary duty, are not specifically listed in the statute. Nevertheless, Massachusetts courts have applied the section to govern interest on common law claims of deceit and claims of unfair practices under Mass. G.L. c. 93A. *See Patry v. Liberty Mobilhome Sales, Inc.*, 394 Mass. 270, 273, 475 N.E.2d 392, 394–95 (1985) (Mass.G.L. c. 231 § 6B governs award of interest on M.G.L. c. 93A damages arising out of false representations concerning sale of mobile home lot); *Brown v. Gerstein*, 17 Mass.App.Ct. 558, 572, 460 N.E.2d 1043, *further app. rev. denied*, 391 Mass. 1105, 464 N.E.2d 73 (1984) (in action against attorney for knowingly making false representations, the deceit and M.G.L. c. 93A claims "basically sound in tort [and] [c]onsequently interest on any sum recovered should be computed in accordance with G.L. c. 231 § 6B"). Indeed, the general section heading for the statute, "Interest added to damages in tort action", implies that all tort actions are covered.

The question, therefore, is whether Leonard's breach of fiduciary duty to appellees by freezing them out of the company should be viewed as a tort. We believe it should be. In order to prove freeze-out, appellees must establish that Leonard intentionally took various actions to deprive them of any corporate benefits and that he thereby breached his fiduciary duty to them as minority shareholders. Massachusetts cases have viewed such breaches as torts. In *Woodcock v. American Investment Company*, 376 Mass. 169, 380 N.E.2d 624 (1978), the court rejected a plaintiff's attempt to characterize a shareholder derivative action as a breach of contract for purposes of a six year statute of limitations. The court stated that "the allegations of the complaint rest on a claim of conversion of funds, plainly a tort claim" and noted that any implication of a simple breach of contract "is belied by the allegation that the misuse of corporate funds was a studied, knowing raid on the corporate treasury". 380 N.E.2d at 627. *See also O'Hara v. Robbins*, 13 Mass.App.Ct. 279,

284, 432 N.E.2d 560, 563 (1982) (breach of duty to minority shareholder in diverting a corporate opportunity not barred by *tort* statute of limitations). A claim of freeze-out, which requires proof of intentional acts taken to deprive another party of property, comes within a classic tort action.

The district court chose not to view this breach of duty as a tort. It noted that "[t]his was not a charge of damages caused by negligence or mismanagement, sounding in tort, but, to go back to old forms of pleading, is a case of assumpsit, where ancient pleaders could waive the tort and sue in contract. Nor is this all ancient history. *See Hendrickson v. Sears*, 365 Mass. 83 [310 N.E.2d 131] (1974)."

It is true that, under common-law pleadings, a plaintiff could choose to bring an action of assumpsit upon a "promise or contract implied by law in certain cases. It is founded on what the law terms an implied promise on the part of defendant to pay what, in good conscience, he is bound to pay plaintiff." Black's Law Dictionary at 157. It may be, therefore, that a minority shareholder could bring a freeze-out claim as a case of assumpsit. *But see Woodcock v. American Investment Company*, 376 Mass. 169, 380 N.E.2d 624 (1978) (rejecting plaintiff's attempt to characterize a shareholder derivative action as a breach of contract.) The rationale behind assumpsit, however, is to allow a plaintiff the flexibility of using a different form of equitable pleading when that form is appropriate. In this case, plaintiffs-appellees have always maintained their suit as a tort action, and have not alleged a breach of contract either specifically or by implication. If Leonard's breach of fiduciary duty may be viewed and sued on as a tort action, as we believe it should be, we do not believe the availability of assumpsit can be used by a court to transform a plaintiff's claim from a tort to a contract action for purposes of the statute that governs interest. Although plaintiffs may now receive a

windfall in the calculation of their interest, precedent binds us to such a reading of Mass.G.L. c. 231 § 6B. *See Charles D. Bonanno Linen Service, Inc. v. McCarthy*, 550 F.Supp. 231, 246–47, (D.Mass. 1982), *aff'd in part, rev'd in part*, 708 F.2d 1, 12 (1st Cir.1983). *See also Sterilite Corporation v. Continental Casualty Company*, 20 Mass.App.Ct. 215, 479 N.E.2d 205 (1985) (interpreting Mass.G.L. ch. 231, § 6C in a manner that allows plaintiffs to receive interest on money not yet paid out), *further app. rev. granted*, 395 Mass. 1103, 482 N.E.2d 328 (1986).

## VIII. *Attorney's Fees*

The district court ordered Leonard to pay appellees $91,000 in attorney's fees. The court rested its decision on the ground that minority stockholders who bring derivative suits on behalf of a corporation are granted counsel fees. *Angoff v. Goldfine*, 270 F.2d 185 (1st Cir.1959). The court concluded that because appellees' freeze-out claim was merely a derivative claim, "plus", the award of counsel fees was appropriate in this case as well.

The general rule in Massachusetts, as elsewhere, is that "attorney's fees are not ordinarily recoverable in the absence of statute, court rule, enforceable contract or stipulation providing therefor". *Bournewood Hospital, Inc. v. Massachusetts Commission Against Discrimination*, 371 Mass. 303, 308, 358 N.E.2d 235 (1976). In *Bournewood*, the SJC pointed out that, although " 'courts of equity, in certain cases under ... [their] general powers, allow counsel fees' ", *id.* at 312, 358 N.E.2d 235 (quoting *Sears v. Nahant*, 215 Mass. 234 at 240, 102 N.E. 491), the "list of exceptional circumstances in which [the SJC has] sanctioned a departure from [its] traditional approach—in the absence of statute or court rule—is not long". *Id.*

In two cases involving breaches of fiduciary duty, the SJC has followed this restrictive approach and denied attorney's fees to prevailing parties. In *Donaldson v. Boston Herald-Traveler Corp.*, 347 Mass. 274, 280–81, 197 N.E.2d 671 (1964), the plaintiff prevailed on his request to view the corporation's stock and transfer books, but was denied his legal costs in bringing the suit. The SJC affirmed the denial, noting that "the general principle has become firmly established in this Commonwealth that no recovery may be had for counsel fees in the very action to redress a plaintiff's wrong". *Id.* at 280, 197 N.E.2d 671. Similarly, in *Manganaro v. DeSanctis*, 351 Mass. 107, 217 N.E.2d 760 (1966), the SJC upheld a trial judge who reversed a master's grant of attorney's fees to successful plaintiffs in a suit for improper depletion of partnership assets. The court noted that, as a matter of law, allowance of such fees was incorrect. *Id.* at 112, 217 N.E.2d 760 (citing *Donaldson* ).

There are a few exceptions to this rule. One is that attorney's fees may be awarded to a litigant who has successfully brought a derivative action on behalf of a corporation. *See Wilson v. Jennings*, 344 Mass. 608, 621, 184 N.E.2d 642 (1962); *Angoff v. Goldfine*, 270 F.2d 185 (1st Cir. 1959). The rationale for this exception is that the litigant has created a fund for the benefit of all the shareholders in the corporation, and is now only receiving benefits incident to that fund. As the SJC explained in *Shaw v. Harding*, 306 Mass. 441, 450, 28 N.E.2d 469 (1940), "the basis for the allowance of counsel fees is that an expense incurred by one, resulting in the creation of a fund for the general benefit of many other persons, ought not to be borne entirely by the one whose action has resulted in the realization of such a fund". *See also* 6 *Moore's Federal Practice*, par. 54.77[2] at 1705–08 (2d ed. 1985) (describing the "fund" exception). In this case, however, appellees were granted recovery on the basis of their personal freeze-out action and have received damages directly. Thus, the basic rationale for allowing the "fund" exception does not exist in this case. Al-

though it may appear ironic, as the district court pointed out, that defendant's more reprehensible conduct in effectuating a freeze-out should result in relieving Leonard from paying attorney's fees he would otherwise have been responsible for in a derivative suit, it is a necessary result given the rationale for the "fund" exception. In this case, appellees are no different from any other plaintiffs who have prevailed in a suit, yet are denied counsel fees.

■ The second exception is that, under a federal district court's broad equitable power, it "may award attorney's fees in favor of one party and against another, where an unfounded action or defense is brought or maintained in bad faith, vexatiously, wantonly, or for oppressive reasons". 6 *Moore's Federal Practice,* par. 54.77[2] at 1709. *See Miaskiewicz v. Le-Tourneau,* 12 Mass.App.Ct. 880, 881, 421 N.E.2d 1236 (1981) (rescript) (petitioner willfully under oath during trial; such bad faith gives rise to one of the traditional exceptions to the general American rule against awarding counsel fees to prevailing party). As Moore notes, "only in exceptional cases and for dominating reasons of justice can the exercise of [this equitable] power by the district court be justified." 6 *Moore's Federal Practice* at 1710–11. Such reasons are not apparent in the record before us and the district court did not refer to them as the basis for its decision.

*The district court's judgment is affirmed, with the exception of that part of it relating to interest and attorney's fees, which is vacated. The case is remanded for further proceedings in accordance with this opinion.*