In re S.N.A. NUT COMPANY, Debtor.

S.N.A. NUT COMPANY, Plaintiff,

v.

TULARE NUT COMPANY, Defendant.

Bankruptcy No. 94 B 5993.
Adv. No. 95 A 1295.

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

Jan. 23, 1997.

Catherine Steege, Evanston, IL, for Plaintiff.

Nabil Zumout, for Defendant.

Steven D. Schneiderman, Chicago, IL.

## FINDINGS OF FACTS AND CONCLUSIONS OF LAW AND MEMORANDUM OPINION

ERWIN I. KATZ, Bankruptcy Judge.

This case comes before the Court on the Complaint of Debtor, S.N.A. Nut Company ("Debtor") objecting to Tulare Nut Company's ("Tulare") secured creditor status and classification as a Class XIV creditor under Debtor's Fourth Amended Joint Plan of Reorganization dated December 6, 1994 ("Plan"). The issue before the Court is whether Tulare has met its burden of proof that it can trace the walnuts sold to Debtor as nuts that it produced and, therefore, can assert a producer's lien in the nuts. This Court has previously ruled that Tulare has the burden of proof to establish that it can trace the nuts grown by Tulare separately from those processed by Tulare for others. See, *S.N.A. Nut Co. v. Tulare Nut Co.*, 197 B.R. 642 (Bankr.N.D.Ill.1996). After a trial on the merits, the Court finds that Tulare has failed to meet its burden so as to assert a lien in the nuts sold to Debtor. Tulare, therefore, is not entitled to secured creditor status under the Plan.

The facts set forth herein shall stand as this Court's findings of fact.

## JURISDICTION

The Court has jurisdiction to hear this matter under 28 U.S.C. § 1334, and General Rule 2.33(A) of the United States District Court for the Northern District of Illinois. This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (C), (K) & (O).

## FACTUAL BACKGROUND

Debtor is an Illinois corporation, headquartered in Elk Grove Village, Illinois, with its principal place of business in Chicago. Debtor was engaged in the business of buying, shelling, processing and selling pecans and other nut products, such as walnuts, to industrial food producers. Occasionally, when Debtor was in short-supply of processed nuts, it bought "finished product" from other processors to meet specific customers' needs. Finished product consists of the nut meat which has been removed from the shell.

In early 1994, Debtor was in short supply on its inventory of certain types of finished walnut products. In order to cover its customer demand, Debtor advised the Debbie Roy Brokerage Company, Inc. ("D.R. Brokerage"), a broker of finished nut products, that it would be willing to purchase processed and packaged walnuts of a specific grade, size and price, from other processors. D.R. Brokerage solicited bids from various nut processors, including Tulare, to fill Debtor's order.

Tulare owns a walnut processing plant, and is a registered walnut processor in the state of California. Tulare processes nuts purchased from other growers under the Tulare name. Additionally, Tulare processes nuts grown and produced from its own orchards. Tulare operates its own orchards under the name of Hughan Farms. The nuts sold to Debtor were sold under the Tulare name. At no time did Tulare notify either Debtor or its broker that any of the nuts sold to Debtor were "produced" by Hughan or that it claimed a lien.

On or about February 10, 1994, Tulare sold, and delivered to Debtor 44,000 pounds (1,760 25–pound cases) of combination walnut halves and pieces[1] for $85,800 ($1.95 per pound) as processed nuts, all of which were processed by Tulare. The parties dispute whether Tulare has demonstrated that those walnuts were grown by Tulare so as to qualify Tulare as a "Producer."

On March 2, 1994, five petitioning creditors filed an involuntary petition in the Western District of Texas, El Paso Division, pursuant to 11 U.S.C. § 303(b), seeking an Order for Relief against Debtor under Chapter 11 of the Bankruptcy Code ("Code"). On March 24, 1994, Debtor consented to the entry of an Order for Relief and the Court transferred venue to the Northern District of Illinois, Eastern Division.

On the petition date, the total amount of processed walnuts in Debtor's possession exceeded 484,000 pounds.

On January 19, 1995, the Court entered an order confirming the Plan. The Plan defines "California Statutory Lien Creditors" as California growers asserting liens under the California Food & Agricultural Code §§ 55631–55635. Pursuant to § 1.15 of the Plan, Class XIV consists of all claims of the California Statutory Lien Creditors. Pursuant to Article III of the Plan, Class XIV is an "unimpaired" class under § 1124 of the Code. Section 3.5 of the Plan provides, "[w]ithin 60 days after the confirmation date, each creditor who contends that it is entitled to full payment of its allowable claim by reason of statutory liens arising under California law, must file with the bankruptcy court and the Debtor a document setting forth the basis for such contention and attaching all documentary support . . . All objections filed to Class XIV claims must be filed within 120 days after the Confirmation Date."

On January 30, 1995, Tulare filed a proof of claim asserting a secured claim. On March 21, 1995, Tulare amended its proof of claim to assert its legal identity as "Tulare Nut" and its status as a Class XIV claimant.

On May 19, 1995, Debtor filed an omnibus Objection to California Grower Claims. On October 31, 1995, Debtor filed an Adversary Complaint objecting to Tulare's secured creditor status and classification as a Class XIV creditor under the Plan. Count I of the Complaint is an action to avoid Tulare's producer's lien under § 545(2) of the Code, on the grounds that the lien was not perfected and enforceable against a hypothetical bona-fide purchaser of walnuts at the time of the commencement of the case. Count II of the Complaint is an objection to Tulare's claim on the grounds that, (1) Tulare is not a producer of farm products entitled to assert a lien under the California statute; (2) Tulare must trace its alleged lien, which is not enforceable against other inventory of the Debtor; (3) Tulare is estopped from asserting its lien; (5) Tulare's claim is disallowable under § 502(d) of the Code since it is subject to avoidance under § 545(2).

Tulare filed a Motion for Summary Judgment, or in the alternative, for Partial Summary Judgment, on both counts of the Complaint, and Debtor filed a Cross–Motion for Summary Judgment.

In a Memorandum Opinion dated June 24, 1996, this Court granted Tulare's Motion for Summary Judgment as to Count I and denied Tulare's Motion with respect to Count II of the Complaint. The Court denied Debtor's Cross–Motion for Summary Judgment as to both Count I and Count II of the Complaint. *S.N.A v. Tulare, supra.*

### DISCUSSION

■ The issue presented is whether Tulare has a valid producer's lien against walnuts sold to Debtor. The burden of proof lies with the party asserting the producer's lien. Tulare must, therefore, establish (1) that it is a producer of walnuts, and, (2) that the walnuts which it grew were not commingled by Tulare with the nuts of others, or

---

1. The term "combination walnut halves and pieces" is an industry-recognized "SKU" (Stock Keeping Unit) that refers to the combination of "black walnuts" and other walnuts. Black walnuts are walnuts which have turned black due to the heat. The United States Department of Agriculture recognizes the term "combination" as a recognized grade of walnut. The term halves and pieces refers to a mixture of the sizes of the walnuts.

that (3) it can trace those nuts to the nuts delivered to Debtor. For the reasons set forth below, this Court finds that Tulare has failed to meet its burden of proof and, therefore, cannot assert a producer's lien over walnuts sold to Debtor. Tulare is, therefore, not entitled to secured creditor status under the Plan.

 If a creditor files a claim, a rebuttable presumption arises that the claim is valid. Fed.R.Bankr.P. 3001(f). Claim objectors carry the initial burden to produce some evidence to overcome this rebuttable presumption. *In re Stoecker*, 143 B.R. 879, 883 (N.D.Ill.1992). However, the ultimate burden of persuasion always lies on the claimant to prove its entitlement to the claim. *In re Octagon Roofing*, 156 B.R. 214, 218 (Bankr. N.D.Ill.1993).

Tulare filed a claim against Debtor, asserting a producer's lien against the walnuts it sold to Debtor under § 55631 of the California Producer's Lien Statute ("Lien Statute") which states in pertinent part:

> Every producer of any farm product that sells any product which is grown by him to any processor under contract, express or implied, in addition to all other rights and remedies which are provided for by law, has a lien upon such product and upon all processed or manufactured forms of such farm product for his labor, care, and expense in growing and harvesting such product. The lien shall be to the extent of the agreed price, if any, for such product so sold. Cal.Food & Agric.Code § 55631.

 Under California law, the Lien Statute provisions are to be construed liberally to promote the Food and Agricultural Code's purposes, which are "promoting and protecting the agricultural industry" and "protect[ing] the public health, safety and welfare." *In re Loretto Winery, Ltd.*, 898 F.2d 715 (9th Cir.1990), *citing*, Cal.Food & Agric.Code § 3 (West 1986). The legislative intent behind the Lien Statute was to assure that producers will be fully compensated for their farm products. *See, McKee v. Bell–Carter Olive Co.*, 186 Cal.App.3d 1230, 1237, 231 Cal.Rptr. 304, 308 (1986).

In order to be entitled to a lien under the Lien Statute, Tulare must have sold walnuts "grown by him" to Debtor. This Court has previously ruled that a producer does not automatically forfeit its lien by engaging in the activity of processing nuts, so long as those operations are separate and distinct. However, this Court will consider whether Tulare should be estopped from asserting a producer's lien because Tulare did not disclose to Debtor that is a producer of walnuts entitled to protection under the Lien Statute.

### Tulare is Estopped from Asserting a Producer's Lien

 Estoppel is an equitable doctrine within the court's discretion and is intended to prevent a party from taking advantage of its own wrong by asserting its strict legal rights. *Tackleson v. Abbott–Northwestern Hospital*, 415 N.W.2d 733, 735 (Ct.App.Minn. 1987). The doctrine of equitable estoppel has four elements: (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury. *Skulnick v. Roberts Express, Inc.*, 2 Cal. App.4th 884, 890, 3 Cal.Rptr.2d 597, 601 (4th Dist.1992), *citing, Driscoll v. City of Los Angeles*, 67 Cal.2d 297, 305, 61 Cal.Rptr. 661, 431 P.2d 245 (1967).

 The four elements of estoppel are present in this case. (1) Tulare was aware that it commingled its own walnuts with other growers' nuts. (2) A party dealing with Tulare, under the Tulare name, for the sale of processed nuts, has a right to believe that Tulare is a processor entitled to the rights of a processor alone. Tulare operates under two business names, Hughan Farms and Tulare and, according to Sandra Hughan, one of the general partners of Tulare, Tulare generally operates under the Tulare name for its processing business and under the Hughan Farms name for its farming and walnut production operations. Additionally, Tulare is a registered processor in the State of California under the "Tulare" name, and not the "Hughan" name. (3) Debtor did not know,

until after it filed for bankruptcy, that Tulare may be entitled to a producer's lien in the nuts sold to Debtor. In its transactions with Debtor, through D.R. Brokerage, Tulare represented itself as "Tulare Nut Company." The sales confirmation Debtor received from D.R. Brokerage, the bill of lading showing a shipment of walnuts on Parkway Trucking, and the sales invoices Debtor received directly from Tulare, all referenced Tulare as the "Tulare Nut Company." Given that Debtor had never engaged in any prior business with Tulare, that Tulare held itself out as a processor only, and, that Debtor specifically requested from D.R. Brokerage to find a walnut processor from whom Debtor could purchase processed walnuts, Debtor had no way of knowing that Tulare was a producer of walnuts, as well as a processor. (4) Debtor relied on Tulare's conduct to its detriment. Because Debtor was not informed that Tulare had a potential lien on the walnuts sold to Debtor, Debtor made no attempt to segregate the nuts in order to preserve the lien. Additionally, Debtor argued before the Court that, had it known that Tulare was also a producer of nuts entitled to assert a lien under the Lien Statute, Debtor would have transacted with another company that solely processed nuts.

The Lien Statute was designed to protect "producers" of farm products, and not processors. Because Tulare held itself out as a processor in its transaction with Debtor, it cannot now take advantage of a lien that only protects producers. Tulare, is therefore, estopped from asserting a lien under the Lien Statute.

### Tulare is not entitled to a producer's lien because it cannot trace which nuts it produced

Assuming, *arguendo*, that Tulare is not estopped, even as a producer of walnuts, Tulare still cannot assert a valid lien in the walnuts sold to Debtor because it commingled its walnuts with walnuts grown by Tulare orchards with walnuts grown by others

and, it cannot trace which of the walnuts sold to Debtor came from Tulare orchards.

Tulare both operates its own 220 acres of walnut orchards and, during the 1993 harvesting season, Tulare operated orchards owned by others, including the Hillman, Cox-Kembco, and Rankin orchards.[2] Tulare also processed walnuts for these growers and for others.

Hillman and Cox-Kembco paid Tulare in cash to operate their orchards at various hourly rates depending upon the machinery and the particular task involved. The Rankins paid Tulare an amount equal to one-third of its walnut production. In addition, Tulare had a separate agreement with these growers whereby Tulare purchased the walnuts grown in the Hillman and Cox-Kembco orchards and the remaining two-thirds of the Rankin crop. Tulare was also paid by these growers and others for processing their walnuts.

■ Tulare is entitled to assert a lien over walnuts it can specifically trace as produced from its own 220 acres of walnut orchards and sold to Debtor. Tulare, as a processor, has no producer's lien over walnuts harvested from the Hillman, Cox-Kembco and Rankin orchards. Tulare must, therefore, prove that its own nuts were not commingled with nuts grown by other growers, or, in the alternative, that Tulare can trace which of the nuts sold to Debtor were grown from Tulare orchards.

Tulare's documents show that Tulare processed its own walnuts with other grower's walnuts. In its Tank Book records, where Tulare lists in which storage tank each shipment of nuts is stored prior to processing, Tulare recorded several tanks in which Tulare nuts were commingled with nuts produced by other growers.[3] Tulare must, therefore, trace the walnuts it produced to the nuts sold to Debtor. It is in this respect, in the tracing of the walnuts from Tulare orchards to the 25-pound boxes shipped to Debtor, that Tulare has failed to satisfy its

---

**2.** The process of "operating" orchards involves complete care of the orchards, including irrigation, pruning, daily caring, harvesting, drying and marketing.

**3.** *See*, Tank numbers 12 through 16, in which Tulare nuts were commingled with other grower's nuts.

burden of proof in persuading this Court that it can identify the nuts sold to Debtor as Tulare nuts.

The problem with tracing walnuts is that when commingled, processed walnuts are indistinguishable. Therefore, walnuts produced from Tulare's 220 orchards look and taste the same as walnuts produced from other growers' orchards.

■ When a fungible asset is commingled, it is considered part of the whole, unless it can be traced. *See, Arduin v. McGeorge,* 595 So.2d 203, 204 (Dist.Ct.App. Fla.1992) (A constructive trust can be imposed only where the trust res is specific identifiable property, or it can be clearly traced.); *Fore Way Express, Inc. v. Mid–American Lines, Inc. (In re Mid–American),* 24 B.R. 52, 53 (Bankr.W.D.Mo.1982) (A party reclaiming money or property from a bankruptcy estate must be able to trace fungibles into the estate.). The burden to trace the commingled asset is on the party claiming a right to it. *See, In re Gemel Int'l, Inc.,* 190 B.R. 4, 11 (Bankr.D.Mass.1995) (A creditor that allows its collateral to be commingled has the burden of proving the validity and the extent of its lien in the commingled proceeds.); *Hollins & Arrousez Electric & Engineering Co. v. Moore,* 31 F.2d 50, 50 (9th Cir.1929), *citing, First Nat. Bank of Princeton v. Littlefield,* 226 U.S. 110, 33 S.Ct. 78, 57 L.Ed. 145 ("[T]he burden of proof is upon the one claiming [a right to the commingled trust fund], and, if he is unable to identify the funds as representing the proceeds of his property, his claim must fail.")

Tulare argues that its business records map out exactly the transition from the in-shell walnut growing on Tulare's orchards to the processed nut packaged and shipped to Debtor, and that, based on its records, Tulare can trace which of the nuts sold to Debtor were Tulare nuts.

Ms. Hughan summarized Tulare's walnut processing operations as follows: Tulare both produces in-shell walnuts, grown from the 220 acres owned by Tulare, and it buys in-shell walnuts from other growers. When the trailers come into Tulare's yards carrying the in-shell walnuts, Tulare then dries and hulls (takes the skins off) the nuts to prepare them for the weighing process. Each grower's nuts are kept separate during the weighing process so that Tulare can accurately calculate the amount due the other grower's for the purchase of their nuts.

The nuts are then weighed and tested for edible meat yield. This information is documented on Incoming Walnut Inspection Sheets, which are created by Tulare to record all incoming walnuts from other growers into Tulare's processing plant as well as those from Tulare's own orchards. The Inspection Sheets contain the name of the grower and the variety, net weight and edible yield [4] of the walnuts brought into Tulare.

After the weighing and testing, the walnuts are put in storage tanks to await the shelling process. At this point, walnuts from different growers, including Tulare nuts, would be deposited into the same tank, depending on when they arrived into the Tulare plant. Tulare has several large tanks, labeled 11 through 16, and several smaller tanks, labeled 5, 6 and 8. It fills tank 15 first, which directly feeds into the nut-cracking machine, called the "Dragon Cracker." As the walnuts are deposited into the tanks, Tulare creates a Tank Storage Book which records the date each grower's walnuts are put in any given tank and an approximate tonnage of nuts that were deposited.

The dragon cracker continuously processes the nuts deposited into Tank 15. It cracks the nuts and sends them through a shaking belt and then an air leg which separate the shells from the edible portion of the walnut. The nuts are deposited into $4 \times 4$ bins and are then sent through an additional air leg to remove any remaining shell-bits. The second air-leg sends the nuts to tables, where Tulare workers manually sift through the nuts, taking out leftover shell-bits and rejecting nuts. After the manual inspection, the

---

4. Edible meat yield is the portion of the nut remaining after it is shelled. The edible meat yield is an approximate amount which is determined by testing 100 pound sample of walnuts, weighing the whole walnuts and then shelling the walnuts and weighing the edible walnut meat.

walnuts are put into 25–pound boxes for shipment to buyers.

In tracing the walnuts from Tulare's orchards to the walnuts sold to Debtor, Tulare relies on four exhibits: (1) the Incoming Walnut Inspection Sheets; (2) the Tank Storage Book; (3) the Dried Fruit Association's ("DFA") Manifests, which document the number of 25–pound boxes of processed walnuts that are inspected by the DFA on any given date. The DFA marks each box inspected with a Date Code which corresponds to the date that box was inspected, and the Manifests list how many boxes share a given Date Code. Additionally, (4) the Load Book Entry, Tulare's list of the boxes shipped to Debtor according to Date Code. Tulare argues that when taken together, the four exhibits outline Tulare's nut processing system and document the flow of each grower's walnuts.

The Court has painstakingly reviewed the exhibits together with the other evidence submitted, in an attempt to calculate the number of walnuts brought into Tulare, the number of walnuts produced by Tulare and the number of walnuts sold to Debtor. This Court cannot determine, by a preponderance of the evidence, which of the nuts sold to Debtor were Tulare nuts. Tulare's argument, that the exhibits describe a flow of nuts from grower to 25–pound boxes of processed nuts, is flawed because the company's records lack precision and detail.

The missing link in Tulare's argument lies with the Tank Book which fails to record the exact tonnage of nuts being deposited into each tank. In many cases, the tank report fails to account for the placement of some incoming nuts.[5] In other cases Tulare fails to list an estimated tonnage.[6] In many cases, the estimated tonnage listed was inaccurate, so that tank placement could not be determined with any degree of certainty.[7]

Further, the Tank Storage Book is inconsistent with Tulare's other documentation and, therefore, unreliable as supportive evidence to Tulare's alleged lien. Without an accurate picture of how the walnuts were stored as they were brought into Tulare's processing plant, Tulare cannot prove that its nuts were the ones shipped to Debtor in the 1760 cases.

5. In her testimony, Ms. Hughan explained that when a load of walnuts are not listed in the Tank Book, she can assume that the load was deposited straight into Tank 15 and into the dragon cracker. She explained that Tulare does not document these loads because the shipments are not stored. However, Tulare gives an account of the deposits into Tank 15 from September 5 through 10, 1993. Tulare, however, failed to account for several loads that arrived at Tulare from grower Hillman on September 7 through 8, 1993. The records do not indicate where these Hillman shipments went when they obviously could not go into Tank 15, which was not unloaded until after September 10, 1993. The unaccounted for shipments are documented in the Incoming Walnut Inspected Sheets as Bates No. 183–183, 1993 and have a total net weight of 51,710 pounds and an edible yield of 20,220 pounds. The problem, therefore, with Ms. Hughan's explanation for the unaccounted for shipments, is that this Court cannot rely on her testimony that when a shipment is not documented in the Tank Storage Book, that it goes directly into the dragon cracker. This Court will, therefore, assume that the unaccounted for shipments were just that, unaccounted for.

Additionally, the Tank Report lists two entries which are not documented in the Incoming Walnut Inspection Sheets: (1) Tank # 12, 1 ton of Payne walnuts from Tulare-owned orchards, deposited on September 12, 1993 and (2) a deposit on September 23, 1993 of Tulare produced Paynes and Serrs (The Tank Book does not specify the Tank number or tonnage amount for this entry), further suggesting that Tulare's documentation is inaccurate and unreliable.

6. These entries list only the tank number, the grower's name, the type of nut and the date the nuts were deposited into the tank. The failure to list even an estimated tonnage inhibits tracing because often Tulare would receive more than one shipment from the same grower on the same day, making it impossible to determine which shipment was deposited into the tank.

7. The most outrageous under and overestimates of walnut tonnage include the following deposits recorded in the Tank Storage Book: 9/10, Hughan Farm Payne nuts listed at 4 tons, with an actual weight of 1,709 lbs.; 9/10, Hughan Farm Payne nuts listed at 4 tons, with an actual weight of 7,417 lbs.; 9/22 Hughan Farm Paynes and Serr nuts listed at 8 tons, with an actual weight of 5,871 lbs.; 9/25 Hughan Farm Payne nuts listed at 9 tons, with an actual weight of 5,424 lbs. The rest of the Tank Storage Book tonnage recordings were off between 1 to 2 tons from the actual weight amount, as listed on the Incoming Walnut Inspection Sheets.

Tulare argues that November 10, 1993 is an important date because Tulare processed the Chandler variety walnuts on November 9 and 10, 1993, as evidenced by the DFA Manifest Reports citing the inspection of processed extra light pieces and halves and pieces from Chandlers on November 10 and 12, 1993. This is significant, according to Tulare, because Tulare could not have processed the Chandlers until it had processed everything else that was not in storage. Tulare never processed Chandler walnuts together with any other types of walnuts.

Tulare's argument fails because, although the Chandler variety walnuts may have been the only walnuts in Tank 15 on November 10 through 12, 1993, Tulare does not account for all of the nuts that were in storage, which included other grower's nuts [8] And, if other grower's nuts were in storage on November 10 through 12, they could have been included in the sale to Debtor. Tulare does not present any evidence disputing this possibility.

Debtor, on the other hand, presented testimonial evidence that suggested that Tulare had more nuts in storage than it accounted for in its documentation. Nick DiGregorio, Debtor's former vice-president, testified that Tulare's estimates, as to how many pounds of combination halves and pieces were processed during the 1993 season, do not add up.

Ms. Hughan testified that after December 13, 1993, Tulare cracked in-shell walnuts exclusively from Tank 16 and from the second load in Tank 14, which would have amounted to approximately 160,000 pounds of in-shell walnuts. According to Mr. DiGregorio, based on a 37% nut meat yield,[9] 160,000

pounds of in-shell walnuts should have yielded 59,200 pounds of finished halves and pieces. Instead, according to the DFA Inspection Sheets, 119,875 pounds of finished halves and pieces were inspected during the same period, for a yield of 74.9%. Conversely, during the beginning of the production season, between September and November 10, 1993, Ms. Hughan testified that she cracked 561,110 pounds of in-shell walnuts. According to the DFA Inspection Sheets, Tulare processed 135,175 pounds of finished halves and pieces during the same period, for a yield of 24%.

Mr. DiGregorio testified that the anomaly in numbers suggests that Tulare did not immediately package its nuts after processing, but that, Tulare stored the processed nuts until it had the capacity or time to package them. He contended that it is not likely that Tulare processed walnuts at a 24% nut meat yield at the beginning of its production season, while processing the nuts at a 74.9% nut meat yield later in the season. An intervening storage period would make commingling of Tulare's nuts with other growers' nuts more likely.

The DFA Manifests and Tulare's Load Book do not support Tulare's claim, that it can trace the walnuts, either. In fact, the documents undermine Tulare's contentions. The DFA Manifest lists a great many more inspected boxes of combination halves and pieces, even past the November 10 through 12, 1993 date, than are listed in Tulare's Load Book, which supports the argument that walnuts were in storage past the No-

8. The following is a list of other grower's walnuts that were not accounted for in Tulare's Tank Storage Book, and, therefore, could have been in storage during the November 10–12 timeframe when Tulare processed the Chandler variety walnuts: Grower Hillman's shipments listed in fn 3 above; the September 13, 1993 shipment of Serr walnuts from grower San Anguiano, Bates No. 194; all of the shipments from September 4 through October 26, 1993, Bates Nos. 203–206, 215, 220, 222, 226, 228, 231, 232, 235, 236, 239–243, which included walnuts from growers Cox–Kembco, Ayers, Blakely, Searcy, Grant Jones, Hillman, Busby, Walton, Nelto, Castro, Gaines, Wilson, Flores, Rosenti and Gould; the November 1, 1993 shipment of a variety mix of walnuts from grower Woods, Bates No. 246; and, two shipments on November 10, 1993 of a variety

mix of walnuts from growers Juan and Javier, Bates No. 310 and 311.

The Tank Storage Book states that grower Rankin's Payne nuts were deposited into bin # 5 on September 27, 1993, but does not indicate when the walnuts were actually processed. Therefore, Rankin's Payne nuts, Bates No. 285, could also have been in storage past November 10–12, 1993.

9. 37% represents the average 42% edible nut meat yield, as stated by Ms. Hughan, minus an additional five percent of nut meat which does not crack into combination halves and pieces, but breaks into smaller pieces, not of the kind sold to Debtor.

 

vember 10 through 12 date, some of which included other grower's walnuts. *See,* fn 5 *supra.* Additionally, Tulare, in its Closing Brief in Lieu of Closing Arguments, understated the amount of boxes inspected by the DFA on several occasions,[10] once again suggesting that Tulare had unaccounted for stored walnuts.

Tulare's use of the DFA Manifests as proof of which grower's walnuts were deposited into which 25–pound box is untenable. With Tulare's lack of accuracy in its Tank Storage Book Report, this Court cannot speculate which boxes contained which walnuts. The DFA Manifests do not suggest in which 25–pound boxes Tulare's nuts were deposited. It is very probable that other growers' stored walnuts were included in the boxes that were sold to Debtor. Nothing Tulare has presented before this Court has refuted that probability.

Additionally, the reliability of Tulare's evidence is circumspect in that the Tank Storage Book, the DFA Manifest Inspection Sheets and the Load Book, the exhibits that allegedly trace Tulare's nuts to the nuts sold to Debtor, were produced at the eve of trial. Ms. Hughan testified at trial that she only remembered that these documents existed two weeks before trial. None of Tulare's previous declarations contained any information that would suggest that Tulare could trace its nuts. In fact, in Ms. Hughan's declaration in support of Tulare's Motion for Summary Judgment, she states that "pursuant to its normal business practices, Tulare Nut processes other growers walnuts, including walnuts produced from orchards operated by Tulare Nut, before the walnuts produced from its orchards and sells the walnuts on a first processed, first sold basis." At trial, Ms. Hughan admitted that the statement was incorrect.

Contrary to Tulare's assertions, the documentary evidence establishes commingling rather than tracing. Once commingled by Tulare, the processor, no lien survives. Tulare, therefore, has not met its burden in proving that the nuts over which it asserts a

10. *Compare,* Tulare's Brief in Lieu of Closing Arguments to DFA Manifests # 27, 28, 31, 33, 35, 37 and 38.

producer's lien were produced by Tulare's orchards.

## CONCLUSION

For the foregoing reasons, Tulare's lien over the walnuts sold to Debtor is disallowed and Debtor's objection to Claim No. 228 is hereby granted.