In re HALMAR DISTRIBUTORS,
INC. and Ralar Distributors,
Inc., Debtors.

General Electric Company Business
Lighting Group, Plaintiff,

v.

Halmar Distributors, Inc., Ralar
Distributors, Inc., and BayBank
Middlesex, Defendants.

Bankruptcy Nos. 89–40976–
HJB, 89–40975–HJB.
Adversary No. 89–4075.

United States Bankruptcy Court,
D. Massachusetts.

March 15, 1999.

George F. Parker, III, Badger, Dolan, Parker & Cohen, Boston, MA, for General Electric.

Charles R. Bennett, Jr., Reimer & Braunstein, Boston, MA, for BankBoston.

Paul R. Salvage, Bacon & Wilson, Springfield, MA, for Debtors.

## MEMORANDUM OF DECISION

HENRY J. BOROFF, Bankruptcy Judge.

Before the Court is the task of determining those remaining issues necessary to finally resolve the dispute between the Plaintiff General Electric Company Business Lighting Group ("GE") and the Defendant BayBank Middlesex[1] (the "Bank").

---

**1.** Since the inception of this case, the defendant Baybank Middlesex has changed its name to BankBoston, N.A. To avoid confusion, the defendant will simply be referred to as the "Bank."

## I. *Facts*

This case has a long and somewhat tortured history.[2] A complete recitation of the facts need not be repeated here as they have been set out in two previously published decisions. *See Gen. Elec. Co., Business Lighting Group v. Halmar Distribs., Inc., et al. (In re Halmar Distribs., Inc.)*, 116 B.R. 328, 329–32 (Bankr.D.Mass. 1990); *aff'd in part rev'd in part, Gen. Elec. Co., Business Lighting Group v. Halmar Distribs., Inc., et al. (In re Halmar Distribs., Inc.)*, 968 F.2d 121, 122–23 (1st Cir.1992) (hereinafter *"Halmar I"* and *"Halmar II"*, respectively).

It is sufficient to note that this is a dispute between two creditors asserting a security interest in the same collateral. GE claimed a purchase money security interest in the inventory it sold on credit to Halmar Distributors, Inc. ("Halmar") and Ralar Distributors, Inc. ("Ralar") (collectively the "Debtors") and its proceeds. The Bank, whose revolving line of credit financed the Debtors' operations, claimed a first priority security interest in the same assets.

Courts within this circuit have spent the last ten (10) years attempting to determine the validity, priority and extent of each party's interest in the Debtors' inventory and the proceeds thereof. See *Halmar I* and *Halmar II. See also Gen. Elec. Co. Business Lighting Group v. Halmar Distribs., Inc. et al. (In re Halmar Distribs., Inc.)*, No. 89–4075 (Bankr.D.Mass. Sept. 7, 1994). The findings and rulings in those decisions are now the law of the case and are incorporated herein by reference. *See Field v. Mans*, 157 F.3d 35, 40 (1st Cir. 1998) (citing *Cohen v. Brown Univ.*, 101 F.3d 155, 167 (1st Cir.1996)) ("The law of the case doctrine is a prudential principle that 'precludes relitigation of the legal issues presented in successive stages of a

single case once those issues have been decided.' ").

In 1995, the case was transferred to this Court. Soon thereafter, this Court, in an unpublished opinion, determined that the unresolved issues consisted of claims by GE against the Bank on account of: (i) the Bank's alleged failure to properly safeguard or turn over collateral upon which GE had a superior security interest after the court (Queenan, J.) granted to the Bank relief from the automatic stay; and (ii) sums collected by the Bank from its Halmar lockbox on and after the effective date of GE's demand with respect to: a) proceeds of GE lamps and bulbs originally sold to Halmar; and b) proceeds of GE inventory originally sold to Ralar. *See Gen. Elec. Co., Business Lighting Group v. Halmar Distribs., Inc., et al. (In re Halmar Distribs., Inc.)*, No. 89–4075 (Bankr. D.Mass. Dec. 13, 1996). These issues were then scheduled for trial.

The trial took place over the course of three days; August 7, September 12 and 15, 1997. At the trial, GE introduced the testimony of Zane Katz, the property manager at Halmar's warehouse, and Grant Gawronski, the GE representative responsible for receipt of GE goods at Halmar's warehouse. Both witnesses testified with respect to the Bank's alleged failure to properly safeguard or turnover collateral owned by GE. GE also offered into evidence the testimony of Joseph Partyka, the former Vice President of Management Systems at Halmar; William D. Fitzpatrick, Jr., the GE employee responsible for ensuring that the Debtor had sufficient GE merchandise to service its customers' needs; and Eric Bergmann, a computer expert hired by GE in 1995 to evaluate the computer records of the Debtor and identify the sales and payments for GE product.[3]

---

**2.** This protracted and convoluted dispute between two sophisticated parties is a "poster child" for a matter best suited for determination by an alternative dispute resolution proceeding. The Court finds the parties' resistance to the Court's recommendation to that effect, as well as their willingness to incur extraordinary costs to continue this endless litigation, inexplicable.

**3.** GE also called Richard Di Vincenzo to testify. Di Vincenzo worked with Eric Bergmann on the project for GE. DiVincenzo's testimony was offered by GE to corroborate the validity of Eric Bergmann's work.

These witnesses testified with respect to the amount of proceeds allegedly received by the Bank from the sale of GE lamps and bulbs. The Bank was given the opportunity to cross-examine GE's witnesses. The Bank did not call any witnesses to testify on its own behalf. Upon conclusion of the evidence, this Court entered directed findings.

First, this Court found that the Bank had exercised reasonable care in protecting GE's goods and had not acted negligently.[4] Further, this Court ruled that GE had not established the value of its allegedly lost or stolen goods and had therefore not proven its damages. *See* Sept. 15, 1997 Hrg. Tr. at 48, 49.

Second, this Court found that GE had not established its claim that the Bank had converted proceeds of the sale of GE lamps and bulbs originally sold to Halmar (excluding an account receivable from Caldor, Inc. discussed more fully below), because the unique computer analysis and program relied upon by GE to identify the Debtors' inventory and sales was neither reliable nor verifiable.[5] *See* Sept. 15, 1997 Hrg. Tr. at 49–52.

At a hearing held on October 20, 1997, it was then determined that the following issues remained for resolution: (1) what interest, if any, was owed by the Bank to GE on account of the Bank's improper collection of an account receivable from Caldor, Inc. (the "Caldor Receivable"), a portion of which represented the proceeds of GE's collateral; (2) what amount, if any, was owed by the Bank to GE on account of the Bank's collection of the proceeds of sale of the GE wiring devices originally sold to Ralar; and (3) what amount, if any, was owed by the Bank to GE arising from an alleged underfunding of an escrow account established pursuant to Judge Queenan's order of October 31, 1989.

At a hearing on February 23, 1998, this Court heard evidence on the remaining issues. The parties further directed this Court to the transcript of evidence taken by Judge Queenan on May 22, 1990. The Bank and GE also submitted post-trial briefs on April 3, 1998 and April 17, 1998, respectively.

## II. *Discussion*

Each of the three outstanding issues will be discussed in turn.[6]

## A. Interest on the Caldor Account Receivable

In 1990, GE and the Bank agreed that a receivable owed by Caldor, Inc. to Halmar included the proceeds of property in which GE held a superior security interest. On December 6, 1990, the court (Queenan, J.) memorialized the parties' agreement in a court order, ruling:

> By reason of the stipulation of the parties, the Plaintiff [GE] has a senior

---

4. This Court applied the standard of care owed by a bailee under Massachusetts law. *See Butler v. Bowdoin Sq. Garage, Inc.*, 329 Mass. 28, 105 N.E.2d 838 (1952) (A bailee for hire is liable for damage to bailed property for failure to exercise the degree of care which would reasonably be expected from an ordinarily prudent [person] in similar circumstances).

5. This determination was based on the standards set forth by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

6. GE presented a fourth issue for determination in its post-trial briefs; namely, what amount the Bank owed GE on account of the Bank's failure to remit $15,759.88 on account of all GE collateral sold to Ralar and collected by the Bank during October, November and December of 1989. Although the parties agree that the sum of $15,759.88 is due to GE and that GE is entitled to interest at 8.09% on this amount, *see* Pl. Post-trial Br. at 3; Def. Post-trial Br. at 7, it appears that the amount is duplicative of the sum determined by this Court to be due to GE below, *see* section B, to the extent of $4,432.44 owed to GE on account of the sale of Ralar wiring devices. *See* Appendix D to Pl. Mem. On Final Acct. Therefore, the Court will order the Bank to pay to GE on account of GE goods *other* than wiring devices the balance of $11,327.44, plus interest at the rate of 8.09% from July 10, 1990.

security interest over the Defendant Baybank Middlesex [the Bank] in receivables of the Defendants Halmar Distributors, Inc. and Ralar Distributors, Inc. arising from the sale of products sold by the Plaintiff [GE], including without limit the receivable of Caldor, Inc. now owned by the Defendant Halmar Distributors, Inc.

Ct. Order, Dec. 6, 1990.

According to GE, and undisputed by the Bank, the Bank received the Caldor Receivable on December 16, 1992 and never remitted any portion of that payment to GE. At the hearing on February 23, 1998, the parties agreed that the Bank owed GE $33,520 in principal for the Bank's improper collection and retention of the portion of the proceeds of the Caldor Receivable in which GE had a superior security interest. *See* Feb. 23, 1998 Hrg. Tr. at 30. However, the parties disagree as to whether the Bank owes GE interest on the amount of their settlement. GE maintains that the Bank's actions constituted conversion of GE's property and that GE is entitled to interest at the rate of twelve (12) percent per annum from December 16, 1992. The Bank contends that the parties settled GE's claim for $33,520 and that it owes GE no more. It should be noted, however, that payment of interest on the settlement of the dispute relative to the Caldor Receivable was discussed at the hearing on February 23, 1998. GE's counsel specifically stated that the parties agreed to settle for $33,520.00 "plus whatever interest th[e] Court deem[ed] appropriate." *See* Feb. 23, 1998 Hrg. Tr. at 30. Counsel for the Bank did not respond. Under the circumstances, this Court can not find that the aforesaid settlement was intended to waive GE's claim for interest on the principal amount agreed by the parties to be due.

■ Conversion is the wrongful exercise of dominion or control over the personal property, including money, of another. *604 Columbus Avenue Realty Trust v. Capitol Bank and Trust Co. (In re 604 Columbus Avenue Realty Trust),* 119 B.R. 350, 370 (Bankr.D.Mass.1990) *aff'd in part vacated in part, Capitol Bank and Trust Co. v. 604 Columbus Avenue Realty Trust (In re 604 Columbus Avenue Realty Trust),* 968 F.2d 1332 (1st Cir.1992); *see also Schmid v. Nat'l Bank of Greece, S.A.,* 622 F.Supp. 704, 713 (D.Mass.1985) *aff'd,* 802 F.2d 439 (1st Cir.1986). "In order to recover for conversion, [a] plaintiff[ ] must show that at the time of the alleged conversion [it] had either actual possession or the right to immediate possession or control of the property in question." *604 Columbus Avenue,* 968 F.2d at 1358; *see also Mechanics Nat'l Bank of Worcester v. Killeen,* 377 Mass. 100, 384 N.E.2d 1231, 1240 (1979). Judge Queenan's order of December 6, 1990 and the agreement of the parties on which it was based established GE's immediate right to possession of its portion of the Caldor Receivable. The Bank's collection and retention of the proceeds of the Caldor Receivable in 1992 was therefore inconsistent with GE's right of control. Under these circumstances, the Bank's actions clearly constituted conversion of the collateral of GE.

■ Damages for conversion include the value of the personalty at the time of conversion and interest thereon from the date of conversion. *See Jackson v. Innes,* 231 Mass. 558, 121 N.E. 489, 491 (1919); *Hall v. Paine,* 224 Mass. 62, 77, 112 N.E. 153 (1916). Interest is awarded by law so that a person wrongfully deprived of the use of property is properly compensated for the attendant delay. *Trustees of Boston and Maine Corp. v. Massachusetts Bay Transp. Authority,* 367 Mass. 57, 65, 323 N.E.2d 870, 875 (1975); *Lawyers' Mortgage Inv. Corp. of Boston v. Paramount Laundries,* 287 Mass. 357, 191 N.E. 398 (1934).

Mass.Gen. Laws.Ann. ch. 231 § 6B governs the award of prejudgment interest in tort actions. *See Sugarman v. Sugarman,* 797 F.2d 3, 14 (1st Cir.1986) ("[T]he general section heading for the statute

[M.G.L.A. ch. 231 § 6B], 'Interest added to damages in tort actions,' implies that all tort actions are covered.").[7] The statute provides that:

> In any action in which a verdict is rendered or a finding made or an order for judgment made for pecuniary damages for personal injuries to the plaintiff or for consequential damages, or for damage to the property, there shall be added by the clerk of the court to the amount of damages interest thereon at the rate of twelve percent per annum from the date of commencement of the action even though such interest brings the amount of the verdict or finding beyond the maximum liability imposed by law.

M.G.L.A. ch. 231 § 6B. Accordingly, interest at a rate of twelve percent a year is added to compensatory damages from the date the action commenced until the date of judgment. However, where a loss is not incurred until after an action is commenced, prejudgment interest should be awarded from the date the loss was incurred "in order to avoid giving a party an undeserved windfall." *See St. Paul Surplus Lines, Ins. Co. v. Feingold & Feingold Ins. Agency, Inc.*, 427 Mass. 372, 377, 693 N.E.2d 669, 673 (1998) (prejudgment interest from time insurer actually made payments as a result of insurance agency's negligent and intentional misconduct).

GE is entitled to be made whole for the Bank's conversion of its money. As a result, this Court will order that the Bank must pay GE $33,520 plus prejudgment interest at twelve percent per year, pursuant to M.G.L.A. ch. 231 § 6B. Interest will be applied from the date of the conversion, December 16, 1992, until the date of the judgment herein.

## B. Identification Of Ralar Wiring Devices Subject to GE's Senior Security Interest

In *Halmar II*, the First Circuit Court of Appeals ruled that GE held a valid security interest in all wiring devices that it sold to Ralar. *Halmar II*, at 128. Further, the court held that, on and after October 13, 1989, the Bank converted the proceeds of goods sold by GE to the Debtors, because GE revoked its acquiescence to the Bank's revolving credit arrangements with the Debtors by its notice of October 13, 1989, objecting to the Bank's collection of the proceeds and demanding payment of those proceeds in which it held a security interest. Consequently, GE became entitled to any proceeds from the sale of Ralar's wiring devices that were collected by the Bank after October 13, 1989.[8]

Accounting for the sums owed to GE from the sale of Ralar wiring devices is complicated by two factors. First, GE failed to perfect its security interest in Ralar's wiring devices. *Halmar II*, at 123–24. Second, the wiring devices owned

---

**7.** Massachusetts courts have applied section M.G.L.A. ch. 231 § 6B to govern interest on common law tort claims as well. *Sugarman v. Sugarman*, 797 F.2d 3, 14 (1st Cir.1986) (citing cases applying M.G.L.A. ch. 231 § 6B to govern prejudgment interest on common law tort claims of deceit and unfair practices under M.G.L.A. ch. 93A). *But see Steranko v. Inforex, Inc.*, 8 Mass.App.Ct. 523, 535 n. 6, 395 N.E.2d 1303, 1310 (Mass.App.Ct.1979) (refuting that M.G.L.A. ch. 231 § 6B governs interest on common law tort claims such as conversion).

**8.** The Bank has argued that GE's security interest in *Ralar's* sale proceeds remains subordinate to the Bank's security interest in those proceeds because GE never gave notice to the Bank that it withdrew its consent to the Bank's collection of *Ralar's* sale proceeds. *See* Df. Post-trial Br. at 4. This Court finds this argument unpersuasive. First, it is clear that Ralar was no longer an ongoing entity after July 1989 when it transferred all of its inventory to the Halmar warehouse. Therefore, when GE sent its demand letter to the Bank withdrawing its consent to the Bank's collection of Halmar's sale proceeds, it was undoubtedly withdrawing its consent to the Bank's collection of proceeds from the sale of goods that were originally owned by Ralar and now in the possession of Halmar. Second, the First Circuit has specifically noted that the Bank "has no overriding equities to dislodge [GE's] priority position as to Ralar goods." *See Halmar II*, 968 F.2d at 126.

by Halmar and those owned by Ralar were commingled. By July 3, 1989, Ralar ceased operating independently of Halmar and moved its inventory into Halmar's warehouse. Upon the transfer of Ralar's inventory, it was incorporated into that of Halmar so that the goods could be sold as Halmar's. Therefore, the commingling of the wiring devices by the Debtors makes it is very difficult to determine the value of GE's security interest in the proceeds of sale of Ralar wiring devices alone.

■ State law (Mass.Gen.Laws Ann. ch. 106 (the "UCC")) governs the resolution of this dispute. *Halmar II,* 968 F.2d at 124. Pursuant to UCC §§ 9–205 and 9–306, a secured party's security interest in collateral is preserved notwithstanding its consent to the debtor's sale of the primary collateral and notwithstanding its consent to the debtor's unrestricted use and disposition of the proceeds, so long as the proceeds of the collateral remain *identifiable. See Matter of Mid State Wood Products Co.,* 323 F.Supp. 853, 857 (N.D.Ill.1971) (emphasis added). Specifically, UCC § 9–205 provides that "[a] security interest is not invalid ... by reason of liberty in the debtor to use, commingle or dispose of all or part of the collateral ... or ... of proceeds ..." Mass.Gen.Laws.Ann. ch. 106, § 9–205. In turn, section 9–306(2) provides that a security interest "continues in any identifiable proceeds including collections received by the debtor." Mass. Gen.Laws.Ann. ch. 106, § 9–306(2). Therefore, GE's security interest was preserved in the Ralar wiring devices so long as the proceeds thereof remained identifiable.

■ GE has the burden of identifying the proceeds from the sale of its collateral. *See S.N.A. Nut Co. v. Tuylare Nut. Co. (In re S.N.A. Nut Co.),* 204 B.R. 537, 542 (Bankr.N.D.Ill.1997) (secured party has the burden of identifying commingled proceeds); *State Nat'l Bank of Platteville v. Cullen (In re Cullen),* 71 B.R. 274, 280 (Bankr.W.D.Wis.1987) (same). "To do this, the secured party must 'trace' the claimed proceeds back to the original collateral; in other words, the secured party must establish that the alleged [identifiable] proceeds 'arose directly from the sale or other disposition of the collateral and that these proceeds [could] not have arisen from any other source.'" *In re Oriental Rug Warehouse Club, Inc.,* 205 B.R. 407 (Bankr.D.Minn.1997) (quoting *C.O. Funk & Son v. Sullivan Equip., Inc.,* 92 Ill. App.3d 659, 48 Ill.Dec. 24, 29, 415 N.E.2d 1308, 1313 (1982) *aff'd* 89 Ill.2d 27, 59 Ill.Dec. 85, 431 N.E.2d 370, 371–72 (1982)). "The goal of 'tracing' is to establish what portion of a commingled account constitutes proceeds of the collateral." *Farmers and Merchants Nat'l Bank, Fairview v. Sooner Cooperative, Inc.,* 766 P.2d 325, 329 (Okla.1988); *see also Connecticut Gen. Life Ins., Co. v. Universal Ins. Co.,* 838 F.2d 612, 620 (1st Cir.1988) (The point of tracing is to follow the particular entrusted assets, not simply to identify some assets).

In factually traceable situations, where accurate business records have been maintained, tracing proceeds into and out of an account can be reasonably simple. *See Gen. Motors Acceptance Corp. v. Taft (In re Dexter Buick–GMC Truck Co.),* 2 B.R. 242, 245–46 (Bankr.D.R.I.1980) (evidence consisting of cash receipt journals, sales invoices, and bank statements of deposits demonstrated which portion of the funds constituted proceeds of the collateral). Where, however, deposited proceeds have completely lost their transactional identity, courts have relied upon artificial tracing methods developed in the law of trusts. *C.O. Funk & Sons,* 59 Ill.Dec. at 87, 431 N.E.2d at 372 (noting that section 1–103 specifically directs that the UCC be supplemented by principles of law and equity); *see also Brown & Williamson Tobacco Corp. v. First Nat'l Bank of Blue Island,* 504 F.2d 998 (7th Cir.1974); *Universal C.I.T. Credit Corp. v. Farmers Bank of Portageville,* 358 F.Supp. 317 (E.D.Mo. 1973); *Ex parte Alabama Mobile Homes, Inc.,* 468 So.2d 156 (Ala.1985).

GE asserts that, relying on both factual evidence and trust tracing principles, it can sustain its burden of proving which funds in the Bank's commingled collection constitute identifiable proceeds from the sale of Ralar's wiring devices. *See* Pl. Post-trial Br. at 5–11. To accomplish this feat, GE has attempted to demonstrate what percentage of the original wiring device inventory belonged to Ralar and then apply that percentage to the total amount of proceeds received by the Bank from the sale of both Debtors' wiring devices. The following is a more detailed account of the tracing method utilized by GE.

To determine what percentage of the total wiring device inventory belonged to Ralar, GE first calculated how much of the original wiring device inventory belonged to Ralar before it was commingled. GE and the Bank agree that, as of July 3, 1989, Halmar was in possession of wiring devices valued at $406,512.00 (at cost) and Ralar of $56,656.00 (at cost). *See* Stip. Fact # 33. GE then contends that, on or after July 3, 1989, GE shipped Halmar an additional $108,355.35 (at cost) of wiring device inventory and shipped Ralar an additional $3,828.12 (at cost) of such inventory. *See* Ex. # 34; Ex. # 35. In total then, according to GE, on and after July 3, 1989, Halmar possessed $514,867.35 (at cost) worth of the wiring device inventory and Ralar owned $60,484.12 (at cost) of the wiring device inventory. To summarize:

| | As of 7/3/89 | After 7/3/89 | Total |
|---|---|---|---|
| HALMAR | $406,512.00 | $108,355.35 | $514,867.35 |
| RALAR | $ 56,656.00 | $ 3,828.12 | $ 60,484.12 |
| HALMAR/RALAR | | | $575,351.47 |

From this evidence, GE calculates that Ralar possessed 10.512552% of the entire GE wiring device inventory held by the Debtors. In other words, out of the Debtors' entire wiring device inventory valued at $575,351.47, Halmar's pro-rata share of the inventory was 89.487448% ("89.4%") or $514,867.35 and Ralar's pro-rata share was 10.512552% ("10.5%") or $60,484.12.

GE next concludes that if Ralar owned 10.5% of the inventory, GE should entitled to 10.5% of the proceeds *collected* by the Bank during the period in which Ralar

wiring devices were sold. According to GE, the Bank collected $781,831.35 in proceeds from the sale of GE wiring devices between July 3, 1989 and May 31, 1990. GE derives that sum by claiming that the Bank collected $335,594.95 from July 3, 1989 through September 14, 1989 (*See* Trial Ex. # 4); $237,431.00 from September 15, 1989 through April 30, 1990 (*See* Ex. YY); and an additional $208,805.40 after May, 1990 (*See* Ex. K; Ex. # 33). GE therefore contends that it is entitled to $82,190.42, being 10.5% of the collections of $781,831.35.

Having set out GE's tracing method, this Court must now evaluate it. If GE cannot sufficiently identify the proceeds of the sale of Ralar wiring devices and/or cannot prove that the Bank received these funds, its claim must fail and its security interest found invalid. *See In re Hollins & Arrousez Electric & Engineering Co.*, 31 F.2d 50, 51 (9th Cir.1929) (citing *First Nat'l Bank of Princeton v. Littlefield*, 226 U.S. 110, 33 S.Ct. 78, 57 L.Ed. 145 (1912)) ("[T]he burden of proof is upon the one claiming [a right to the commingled (account)] and if he is unable to identify the funds as representing the proceeds of his property, his claim must fail.").

At the outset, this Court notes that "adherence to specific equitable principles, including rules concerning tracing analysis are 'subject to the equitable discretion of the court.'" *United States v. Durham*, 86 F.3d 70, 72 (5th Cir.1996) (quoting *Quinn v. Montrose State Bank (In re Intermountain Porta Storage, Inc.)*, 74 B.R. 1011, 1016 (D.C.Colo.1987)). This Court further recognizes the need to construe the UCC liberally so as to promote its underlying policy of simplifying and modernizing commercial transactions. Mass.Gen.Laws Ann. ch. 106, § 1–102; *see also Halmar II*, 968 F.2d at 124–25.

Proration is a viable form of tracing where there are two or more secured creditors with an interest in commingled proceeds. *Gen. Motors Acceptance Corp.*

*v. Norstar Bank, N.A.,* 141 Misc.2d 349, 355, 532 N.Y.S.2d 685 (N.Y.Sup.Ct.1988). Employing this approach, a court may consider identifiable proceeds as a pro-rata share of the commingled account, the share being determined by the percentage of collateral owned by the secured creditor before the proceeds were commingled. *See Bombardier Capital, Inc. v. Key Bank of Maine,* 639 A.2d 1065 (Me.1994) (recognition of two secured creditors interests required prorating the account balance); *Mid–States Sales Co., Inc. v. Mountain Empire Dairymen's Assoc., Inc.,* 741 P.2d 342 (Colo.Ct.App.1987) (secured creditor which has a security interest in fifty-two percent of the debtor's inventory had a fifty-two percent interest in total proceeds); *Ford Motor Credit Co. v. Troy Bank & Trust Co.,* 76 B.R. 836 (M.D.Ala. 1986) (debtor's bank account should be divided pro-rata between the two secured creditors); *In re Koch,* 54 B.R. 26 (Bankr. W.D.Wis.1985) (same). "This accounting method has been universally accepted in ... other jurisdictions that have interpreted section 9–306(2) ... [t]here is no compelling reason to reject it." *Norstar Bank,* 141 Misc.2d at 355, 532 N.Y.S.2d 685.

Based on the foregoing, this Court finds that the pro-rata method of tracing used by GE is an acceptable means to identify the proceeds of its collateral. However, on its own analysis of the underlying documents, it appears that GE is entitled to only 10.289505% of any proceeds collected by the Bank, not 10.5% as argued in GE's post-trial brief. Having extensively reviewed the exhibits admitted into evidence, this Court finds the following to be the more accurate calculation with the corrected numbers set in bold below:

| | As of 7/3/89 | After 7/3/89 | Total | |
|---|---|---|---|---|
| HALMAR | $406,512.00 | $120,827.30 | $527,339.30 | (10.289505%) |
| RALAR | $ 56,656.00 | $ 3,828.12 | $ 60,484.12 | (89.710495%) |
| HALMAR/RALAR | | | $587,823.42 | |

*See* Stip. Fact # 33; Ex. # 34; Ex.# 35.

 However, GE's difficulties are not yet overcome. In addition to proving that the Ralar wiring inventory comprised 10.289505% of the total, it must also prove that the Bank received the proceeds in which it is claiming a security interest. Section 9–306(1) provides in relevant part, "proceeds includes whatever is *received* upon the sale, exchange, collection, or other disposition of collateral or proceeds." Mass.Gen.Laws Ann. ch. 106, § 9–306(1). The receipt requirement within this definition is imperative. A secured party's interest in proceeds from the sale or disposition of its collateral is only perfected if it can prove the debtor received the proceeds. *See Halmar I,* 116 B.R. at 334. In this case, the Bank collected the proceeds of the sale of Halmar and Ralar goods through the escrow account which was being held pending a determination of GE's rights in the proceeds.

This Court has painstakingly reviewed the exhibits, together with the other evidence submitted, in an attempt to determine whether GE has met its burden of proving that the Bank in fact received a total of $781,831.35 in proceeds from the sale of GE's wiring devices. After such review, this Court has concluded that GE has not met its burden to demonstrate by a preponderance of the evidence that *all* of the sale proceeds were collected by the Bank. *S.N.A. Nut,* 204 B.R. at 543.

This Court finds that $335,594.95 in proceeds arising from the sale of GE wiring devices was collected from July 3, 1989 through September 14, 1989. An exhibit to that effect, Trial Exhibit # 4, entered into evidence by GE during the 1990 trial, was not challenged by the Bank. It was prepared by Phillip E. McTague ("McTague"), a financial consultant to the Debtor from September, 1989 to April, 1990 and then hired by the Bank. *See* May 22, 1990, Trial Tr. at 183; Feb. 23, 1998, Hrg. Tr. at

39. McTague was retained to track the sales of GE product that should be placed in the escrow account. *Id.*[9]

Similarly, this Court is satisfied that the Bank received an additional $237,431.00 in proceeds from the sale of wiring devices from September 15, 1989 through April 30, 1990. *See* Exhibit YY. Exhibit YY relates to proceeds deposited into the escrow account during the bankruptcy case and is an extension of Exhibit 9D. Exhibit YY was admitted into evidence by GE, without objection by the Bank, on September 15, 1997. *See* Sept. 15, 1997, Hrg. Tr. at 58; *see also,* Feb. 23, 1989, Hrg. Tr. at 40. This exhibit was not only prepared by a Bank employee with sufficient knowledge and data to create the evidence, but the same underlying data was relied on by Judge Queenan in *Halmar I. See* Exhibit 9D.

Conversely, this Court has no basis upon which conclude that the Bank collected an additional $208,805.40 in wiring device proceeds from sales conducted during May, 1990. The only evidence submitted by GE to prove that the Bank received such monies was Exhibit # 33, consisting of copies of five sales invoices. These sales invoices purport to show that wiring devices were sold to five separate buyers and that those buyers were obligated to pay a total of $208,805.40 for the goods. However, no

evidence was submitted to demonstrate that the invoices were paid. No bank statements, check receipts or sales deposit slips have been presented to prove that the Bank received $208,805.40 from those sales. As GE can well appreciate, it is one thing to be owed money and another to collect it. Accordingly, this Court finds that GE has not sustained its burden of proving that $208,805.40 were collected by the Bank on account of sales of wiring devices during May of 1990.

Finally, the Bank is still in possession of GE wiring devices valued at $80,259.78 (at cost). Df. Post-trial Br. at 5 n. 4. GE agrees with this valuation of the goods. Pl. Memo on Final Acct'g at 13. Both parties also agree that at least a portion of these goods can be attributed to Ralar's wiring device inventory. Df. Post-trial Br. at 5 n. 4; Pl. Memo on Final Acct'g at 13. GE contends that it is entitled to its 10.5% pro-rata share, or $8,437.35, of the inventory being held by the Bank. GE also argues that Bank should pay GE $8,437.35 in cash in lieu of a portion of the subject goods. The Bank would prefer to return all the wiring devices it is currently holding to GE in satisfaction of any and all claims GE has for Ralar wiring devices and proceeds. Df. Post-trial Br. at 8.

The Bank obtained possession of the wiring devices it is currently holding after

---

9. GE has confused the analysis by arguing that all of the collections made prior to October 13, 1989 should be attributed to Halmar and not Ralar sales. GE reasoned that Halmar could not sell Ralar's inventory until it was physically placed in Halmar's warehouse and logged into Halmar's inventory computer database; and that this did not occur until October 19, 1989. At the 1990 trial before Judge Queenan, Jerald Moskow, an employee of GE, testified that, on a visit to Halmar's warehouse on July 20, 1989 he was informed that Ralar's goods were currently being stored in trucks outside of Halmar's warehouse. *See* May 22, 1990 Trial Tr. at 39–40. Further, the Debtor's Weekly Stock Status Report, a computer report of the Debtor's inventory, first identifies Ralar's goods as part of Halmar's inventory on October 19, 1989. *See* Ex. 16, p. 271. Therefore, GE asserts that this evidence establishes that Ralar's wiring

device inventory could not have been sold before October 19, 1989.

This Court need not evaluate the credibility of that testimony (which would appear to harm GE's position) because it was offered by GE. However, the parties do not dispute the amount actually collected during this overall time period, and the proration methodology of tracing does not rely on the existence of an even pattern of sales and collections over time. The reason for using proration is because the party with the burden to identify the proceeds of its collateral can not with exactitude show when its collateral was liquidated. It is therefore not inconsistent to conclude that the identification of a limited period in which commingled collateral was not liquidated is immaterial to the imposition of a proration factor on all collections of the commingled inventory over the entire time period.

it was permitted to foreclose on the collateral in April of 1990. Therefore, the goods being held by the Bank could be inventory of either Halmar or Ralar, and more likely some of each. As a result, this Court finds that GE is entitled to the same pro-rata share (10.289505%) of the inventory. Further, GE is entitled to decide whether to accept payment of $8,258.33 or to accept goods valued at this price. This situation is analogous to that of a party who has a cause of action for conversion. It is well-settled that a party aggrieved by a conversion which consists of the taking of property has the right to elect whether to retake the property or to bring an action for conversion and seek monetary compensation for the value of the property. *See Jackson v. Innes*, 231 Mass. 558, 560, 121 N.E. 489 (1919); *Lawyers' Mortgage*, 287 Mass. at 361, 191 N.E. 398; *George v. Coolidge Bank and Trust Co.*, 360 Mass. 635, 641, 277 N.E.2d 278, 283 (1971). Accordingly, GE has to right to recover $8,258.33 in monetary compensation from the Bank.

## C. Amount Due on the Escrow Account

The remaining issue between the parties relates to the funding of the escrow account established pursuant to Judge Queenan's Order of October 31, 1989. In *Halmar I*, the court added $3,500 on account of the Bank's failure to hold the funds in an interest bearing account until March 27, 1990 (the "Interest Fee"). *Id.* In addition, the court, in two orders amending the judgment, held that prejudgment interest of five percent ("5%") would accrue on the escrow account from March 28, 1990 to July 10, 1990, and that post-judgment interest of 8.09% would accrue from July 10, 1990.[10] *See* Sept. 20, 1990

and Dec. 6, 1990 Orders Amending Judgment.

The issues that are now before this Court are what amount of sale proceeds were or should have been deposited in the escrow account and what amount of interest is due from the account. According to the Bank, the escrow account was properly funded with $204,928.24 in proceeds from the sale of GE inventory. *See* Df. Memo on Final Acct'g at 1–2. This Court has reviewed the submissions made by GE to contest that assertion, and finds its arguments and calculations indecipherable, with the exception of three complaints, two of which appear to have merit and are not substantially contested by the Bank.

First, GE claims that it has never been paid the $3,500 of additional interest added to the escrow account by order of Judge Queenan. Pl. Post-trial Br. at 4. The Bank states that it has paid the $3,500. Df. Post-trial Br. at 3. Besides these blanket assertions, neither party has submitted any evidence to prove whether or not the Bank paid the Interest Fee. Therefore, because the burden rests on GE to prove that the Bank did not pay the Interest Fee, this Court rules in favor of the Bank.

Second GE complains that the Bank improperly deducted from GE's proceeds the fees of McTague in the sum of $5,328.00, and that the amount should be recredited. This Court agrees and, in its post-trial submissions, the Bank appears to have conceded the point.

Third, GE is entitled to unpaid interest on $204,928.24, the amount which the Bank paid out of the escrow account at the rate of 8.09% commencing July 10, 1990—with the exception of the McTague Fee with respect to which interest should run at the rate of 5% from May 31, 1990[11] when it

---

**10.** The postjudgment interest rate was established in accordance with 28 U.S.C. § 1961.

**11.** At trial, McTague testified that he was hired by and worked for the Bank in April and May, 1990. *See* May 22, 1990, Trial Tr. at 183; Feb. 23, 1998, Hrg. Tr. at 39. This Court finds it likely that the Bank paid McTa-

gue's Fee either while the job was being performed or in some reasonable period after the job was completed. Without any other evidence, this Court finds that the Bank did or should have paid McTague's Fee in or around May 31, 1990.

was presumably deducted from the account until July 10, 1990, and at the rate of 8.09% thereafter. See Judge Queenan's Orders of Sept. 20, 1990 and Dec. 6, 1990.

### III. *Conclusion*

Based on the foregoing this Court concludes that the Bank owes GE:

(1) $33,520 for collection of the Caldor, Inc. receivable, plus interest at the rate of 12% per year from December 16, 1992 through the date of the judgment herein, and thereafter, at the rate of 8.09%;

(2) GE $11,327.44 for collection of Ralar receivables for GE goods other than wiring devices, together with interest at the rate of 8.09% per year from July 10, 1990 through the date of payment;

(3) $67,219.86 for collection of proceeds attributable to the sale of Ralar wiring devices and on account of the remaining inventory, together with interest at the rate of 8.09% per year from July 10, 1990 through the date of payment; and

(4) $5,328.00 on account of the improper deduction of the McTague fee, together with interest of 5% per year from May 31, 1990 through July 10, 1990 and at the rate of 8.09% per year thereafter through the date of payment.