In the

# United States Court of Appeals
## For the Seventh Circuit

No. 03-4144

VAN DIEST SUPPLY CO.,

*Plaintiff-Appellant,*

*v.*

SHELBY COUNTY STATE BANK,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 99 C 3195—**Jeanne E. Scott**, *Judge.*

ARGUED SEPTEMBER 15, 2004—DECIDED OCTOBER 3, 2005

Before EVANS, WILLIAMS, and SYKES, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Van Diest Supply Co. and Shelby County State Bank ("Shelby") both assert a security interest in proceeds of accounts resulting from inventory Van Diest sold to Hennings Feed and Crop Care ("Hennings"). This case arose after Hennings filed for bankruptcy and was unable to pay for certain inventory it had purchased from Van Diest. Pursuant to a loan agreement with Hennings, Shelby had received the proceeds of many Hennings accounts receivable. Van Diest claimed a first, perfected purchase money security interest in proceeds of inventory it sold to Hennings and sued Shelby for conversion, seeking to recover the proceeds of inventory it sold to Hennings. The district court, in

granting Shelby's motion for summary judgment, ruled that Van Diest had not presented evidence sufficient to carry its burden of identifying the proceeds. We agree and so affirm the decision of the district court.

## I.  BACKGROUND

At issue here are the proceeds of certain inventory that Van Diest Supply Co. sold to Hennings Feed and Crop Care. Hennings was a retail dealer in agricultural products, including chemicals, fertilizer, and limestone who purchased inventory from multiple suppliers, including Van Diest. In 1983, Van Diest and Hennings executed an agreement that granted Van Diest a purchase money security interest in inventory supplied by Van Diest, and the proceeds from such inventory. We concluded in an earlier case that the security interest did not extend to all Hennings inventory; instead, it was limited to inventory Van Diest supplied to Hennings. *Shelby County State Bank v. Van Diest Supply Co.*, 303 F.3d 832, 840 (7th Cir. 2002).

Although Hennings had multiple suppliers, it did not (1) segregate inventory by supplier, (2) track inventory by supplier, or (3) know on any given day how much inventory it had on hand from any supplier. On May 16, 1998, Hennings and Shelby signed a "Draw Note-Fixed Rate" agreement that allowed Hennings to draw up to $4 million at a time, and Shelby made advances to Hennings under the Note in exchange for Hennings's accounts receivable. Shelby then collected the receivables. Shelby purchased Hennings's receivables from May 1998 until either December 14, 1998 or January 7, 1999 and received payments totaling over $2 million.

In late March or early April 1999, Van Diest received a financial statement from Hennings dated September 30, 1998. Based on the financial statement, Van Diest's credit manager believed Hennings was insolvent. Van Diest had

already shipped additional product to Hennings, and payment was not due until June 11, 1999. Hennings was still current on its obligations, and Van Diest did not take any steps to enforce its rights under its security agreement with Hennings.

April 1999 also marked the first time that Hennings conducted a physical inventory. At the time, Hennings's computer records listed an inventory of approximately $7 million, but a check of the physical inventory revealed a missing $2.5 million in inventory.

Hennings first defaulted on a payment to Van Diest on June 11, 1999 and that day, Van Diest sent a demand letter to Hennings requesting payment in full. Van Diest did not learn of Shelby's factoring arrangement with Hennings until July 1, 1999. Hennings filed for bankruptcy the next month, on August 23, 1999. Van Diest then demanded payment of the funds paid to Shelby from the accounts factored under the Note, and Shelby refused to pay Van Diest.

Van Diest filed suit against Shelby, alleging that Shelby converted its property. The district court granted summary judgment in favor of Shelby, and Van Diest now appeals.

## II. ANALYSIS

Our review of a district court's grant of summary judgment is de novo. *Dumas v. Infinity Broad. Corp.*, 416 F.3d 671, 676 (7th Cir. 2005). Summary judgment is proper only when "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). We will review all the facts and draw all reasonable inferences in favor of Van Diest, the non-moving party. *Dumas*, 416 F.3d at 676. To defeat a motion for

summary judgment, the non-moving party cannot rest on the mere allegations or denials contained in his pleadings, but "must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial." *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000) (citations omitted). "However, neither presenting a scintilla of evidence, . . . nor the mere existence of some alleged factual dispute between the parties or some metaphysical doubt as to the material facts, is sufficient to oppose a motion for summary judgment. . . . The party must supply evidence sufficient to allow a jury to render a verdict in his favor." *Id.* at 1088 (internal citations omitted).

Van Diest sued Shelby under a theory of conversion, a dispute governed by state law. In diversity cases, we apply the substantive law of the state in which the district court sits. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). Here, Illinois law governs the dispute. In order to recover for conversion in Illinois, a plaintiff must show: (1) a right to the property; (2) an absolute and unconditional right to the immediate possession of the property; (3) a demand for possession; and (4) that the defendant wrongfully and without authorization assumed control, dominion, or ownership over the property. *Cirrincione v. Johnson*, 703 N.E.2d 67, 70 (Ill. 1998).

Van Diest held a perfected, first priority purchase money security interest in the inventory it sold to Hennings. Shelby, also a secured party, claimed a security interest in all inventory, accounts receivable, and equipment of Hennings. Van Diest contends that Shelby converted its property when Shelby received the proceeds from the sale of inventory Van Diest had supplied to Hennings. Van Diest does not challenge the district court's finding that the funds Hennings paid to Shelby directly by check written on Hennings's bank accounts are not at issue. Still at issue, though, are the direct payments to Shelby from Hennings's

customers which did not pass through Hennings's bank account. After Hennings drew on the Note, and Shelby received accounts, Hennings customers either paid Shelby directly or wrote checks to Hennings, which Hennings delivered to Shelby. Van Diest contends it can show that each of these payments came from the sale of its collateral by showing the proportion of Hennings's inventory on the date of each transaction that was attributable to product that Van Diest had provided to Hennings.

The conduct that forms the basis of Van Diest's complaint occurred before July 1, 2001 and before the Illinois legislature enacted a revised version of Article 9 to its Uniform Commercial Code. *See* Ill. P.A. 91-893 § 5 (July 1, 2001). The parties do not dispute that the Code as it existed prior to July 1, 2001 applies in this case. At the time relevant here, the Code defined "proceeds" to include "whatever is received upon the sale, exchange, collection or other disposition of collateral or proceeds." 810 ILCS § 5/9-306(1) (West 1994). Significantly here, the Code also provided that a party continued to have a security interest in the proceeds of the sale of inventory to the extent that the proceeds were "identifiable." 810 ILCS § 5/9-306(2) (West 1994).

It is clear in Illinois that commingling does not necessarily make proceeds unidentifiable. First, 810 ILCS § 5/9-205 (West 1994) specifically provides that "a security interest is not invalid . . . by reason of liberty in the debtor to use, commingle, or dispose of all or part of the collateral . . . or to use, commingle, or dispose of proceeds." In addition, section 9-306(2) (West 1994) states that a security interest "continues in any identifiable proceeds." Finally, the Illinois Supreme Court recognized in *C.O. Funk & Sons, Inc. v. Sullivan Equip., Inc.*, 431 N.E.2d 370, 372 (Ill. 1982) that a security interest could continue in a commingled account if the proceeds were identifiable. *See also Brown & Williamson Tobacco Corp. v. First Nat'l Bank*, 504 F.2d 998, 1001-02 (7th Cir. 1974). Therefore, so long as the proceeds

were identifiable, Van Diest's security interest in the proceeds of the sale of the inventory it supplied to Hennings continued.

The Code does not define the term "identifiable." It does, however, direct that its provisions should be supplemented by "principles of law and equity." 810 ILCS § 9/1-103 (West 1994). Like many other courts, the Illinois Supreme Court has construed this provision to allow a party to identify proceeds using a tracing theory known in the law of trusts as the "lowest intermediate balance rule." *See Funk*, 431 N.E.2d at 372-73.

In this case, the district court concluded that Van Diest did not present evidence sufficient to allow it to identify its proceeds. Therefore, it concluded that Van Diest had not presented evidence that it had an ownership interest in the proceeds Shelby received from the sale of Hennings's inventory, an immediate right to possession of those proceeds, or that Shelby assumed wrongful control over those proceeds. Because Van Diest had not presented sufficient evidence on elements for which it had the burden at trial, the district court granted Shelby's motion for summary judgment.

On appeal, Van Diest contends the district court erred when it found it could not trace its proceeds. Unfortunately, Hennings's commingling of the inventory it purchased from multiple suppliers makes this case difficult. Hennings purchased the same product from more than one supplier, but it did not segregate the inventory it received by supplier. In addition, although Hennings maintained records of the products it sold, these records did not track the company that had supplied Hennings with the product sold.

*Funk* is the only Illinois Supreme Court case to consider whether proceeds of collateral were sufficiently identified to subject them to a security interest. In that case, the court placed the burden of identification on the

party seeking to identify the proceeds, stating, "Since Funk is claiming a prior security interest in property which is otherwise identified as collateral belonging to the bank under its after-acquired property clause, the burden of identifying the proceeds is properly upon Funk." 431 N.E.2d at 373. The court then found that Funk failed to identify the proceeds, stating:

> Funk argues that it established a *prima facie* case by showing that secured property was sold, that the proceeds were deposited into an account, and that other items of inventory were purchased from that account, and that upon such showing the burden should shift to another to segregate the wrongfully commingled funds. Were we concerned here with the rights of Funk against Sullivan this argument would have considerable merit. The bank, however, was neither responsible for Funk's position nor for the commingling and is at least as innocent as Funk. We find no principles in law or equity which dictate that the innocent third party must suffer the consequences of Funk's predicament. Section 9-306 says that the security interest attaches to identified proceeds. . . . Funk failed to offer the proof required to identify the claimed proceeds and is not now entitled a second opportunity to do so.

*Id.*

*Funk* makes clear that Van Diest has the burden of identifying the proceeds from the sale of the inventory it supplied. *See id.* Van Diest has admitted that it "cannot at this time state the amount of its pro rata share in the mass of inventory." It contends, however, that the amount of its pro rata share is an issue of fact for trial or relevant only to damages. We disagree that tracing of Van Diest's proceeds is only a means to calculate damages and

is not relevant to liability, as *Funk* clearly states that a security interest continues only in "identifiable proceeds." 431 N.E.2d at 372. When it recently considered the same argument, the Eighth Circuit explained, "tracing . . . is not a measure of damages. It is the primary means of demonstrating the plaintiff's rights, and therefore the defendant's liability, in cases involving commingled accounts. . . . Without equitable tracing, [the plaintiff] cannot make out a claim for conversion because it cannot establish that the funds allegedly converted were identifiable proceeds in which it had a security interest." *General Elec. Capital Corp. v. Union Planters Bank, N.A.*, 409 F.3d 1049, 1059 (8th Cir. 2005).

We also disagree with Van Diest that it has presented sufficient evidence to survive summary judgment and that only an issue of fact as to the amount of its pro rata share remains. To carry its burden of identifying proceeds, Van Diest has chosen to employ a pro rata tracing method that it contends was used in *In re San Juan Packers, Inc.*, 696 F.2d 707 (9th Cir. 1983), and *In re Halmar Distributors, Inc.*, 232 B.R. 18 (Bankr. D. Mass. 1999). Although Illinois courts have not considered whether proration is an appropriate means of tracing where more than one creditor has a security interest in commingled proceeds, *cf. Funk*, 431 N.E.2d at 372-73 (recognizing lowest intermediate balance rule as an appropriate method of tracing), other courts have recognized that proration can be used to trace commingled proceeds. *See Halmar*, 232 B.R. at 26; *Gen. Motors Acceptance Corp. v. Norstar Bank, N.A.*, 532 N.Y.S.2d 685 (N.Y. Sup. Ct. 1988); *Bombardier Capital, Inc. v. Key Bank of Maine*, 639 A.2d 1065 (Me. 1994). Shelby agrees that, as a general matter, the pro rata method of tracing is an acceptable methodology for tracing collateral. It contends, however, that the method is not appropriate here.

The court in *Halmar* described the proration method of tracing proceeds as an approach where "a court may

consider identifiable proceeds as a pro-rata share of the commingled account, the share being determined by the percentage of collateral owned by the secured creditor before the proceeds were commingled." 232 B.R. at 26. In this case, as a result of the Note agreement between Hennings and Shelby, Hennings's customers either paid Shelby directly or wrote checks to Hennings which Hennings delivered to Shelby. Van Diest maintains it can demonstrate that each payment resulted from the sale of its collateral by showing the proportion of Hennings's inventory on the date of each transaction attributable to inventory Van Diest had supplied to Hennings. As the district court explained, Van Diest's approach posited that if, "[f]or example, on October 1, 1997, Van Diest had supplied Hennings with 10% of its inventory in Product A, then Van Diest would have had a security interest in 10% of the total inventory in Product A on that day, and 10% of the proceeds from the sale of Product A on that day."

The problem with the methodology Van Diest has employed is that it requires it to present evidence at some point in time of the percentage of Hennings inventory supplied by Van Diest. Van Diest, however, has presented no such evidence. To the contrary, Van Diest acknowledges that "It was not possible to know the total amount of any particular product that was on hand on any particular day. No records exist that show the various percentages of products supplied by different suppliers as of any particular day." (Undisp. Facts 11.)

If there was evidence of the proportion of Hennings inventory attributable to Van Diest, then to show the proportion of sale attributable to Van Diest product on any given day, Van Diest could present evidence of increases and decreases in Hennings's inventory over time as Hennings purchased more inventory from suppliers and

sold inventory to customers. Without an initial percentage, however, Van Diest's methodology fails.

In an effort to present the necessary evidence, Van Diest submitted the affidavit of Douglas Main, a paralegal, numerous records, and reports Main produced from these records. Main selected October 1, 1997 as the starting point for determining Van Diest's interest in inventory it supplied to Hennings. He then created reports, including a report summarizing Hennings's purchases by product during the period from October 1, 1997 through December 9, 1998. This report detailed the total dollars of all purchases, the total dollar of purchases from Van Diest, and the resulting percentage of Van Diest's purchases to the total of all purchases. For each product detailed, Main then multiplied this percentage against every account for which an invoice appeared on Shelby's records, regardless of when the account was generated or whether the account had been paid by check from an account debtor or by Hennings from its general deposit account. Main concluded that Shelby received $5,095,034.15 from the sale of Hennings's inventory and that 18.66%, or $950,477.55, was the proportionate share subject to Van Diest's security interest.

Main stated that in arriving at his conclusions, he made several assumptions. These assumptions included that the data he received concerning Hennings's purchases of inventory was accurate and that "Van Diest's shares of the beginning product inventories were in the same proportion to its shares of those same products which it supplied during the period of 10/1/97 through 12/9/98." The district court concluded that neither assumption had support in the record.

Van Diest contends that the district court's determination that the records were unreliable constituted a factual or credibility determination not proper at the summary judgment stage. It is undisputed, however, that on any

given day in 1998 or 1999, Hennings did not know how much inventory it had in its warehouse from any supplier. Moreover, Hennings did not check its records against a physical inventory until April 1999. It is also undisputed that the physical inventory count revealed that the computer records used by Main, which listed inventory of $7 million, overstated the actual inventory by $2.5 million.

Significantly, even if Hennings's records accurately recorded the inventory as of October 1, 1997, Van Diest has not presented any evidence of the amount of that inventory that was subject to its security interest. Main assumed that Van Diest's proportion of Hennings's inventory on that date was the same as the proportion in which it supplied Hennings thereafter, but there is nothing in the record to support that assumption. Van Diest cannot overcome a motion for summary judgment with speculation. *See Packman v. Chi. Tribune Co.*, 267 F.3d 628, 637 (7th Cir. 2001). Because the starting balances of each product necessarily affect later percentages, speculation as to the starting proportions means that all future percentages Main calculated were also merely speculative. Showing the amount of product supplied to Hennings after October 1, 1997 is not sufficient when there is no evidence of the starting proportion.

Although the court in *Halmar* found a creditor had identified proceeds using the pro rata method, *Halmar* does not help Van Diest. In *Halmar*, the parties agreed on the quantity of inventory before commingling and agreed on the proportion of starting inventory subject to the secured creditor's claim. 232 B.R. at 25. From there, the secured creditor presented evidence of the total product shipped to a company and calculated the percentage attributable to it. *Id.* Unlike the plaintiff in *Halmar*, however, Van Diest has presented no evidence of the percentage of inventory it supplied before the goods were commingled.

In short, Van Diest had the burden of identifying its proceeds, and it has not presented evidence to show that it

could do so under the only methodology it presented. Of course, this is a difficult result for Van Diest, as Hennings, one of its long-time customers, failed to pay it for inventory it had ordered. Noticeably absent from this case, of course, is Hennings. Hennings's inability to pay its debts means that there are insufficient funds to pay both Van Diest and Shelby. Under Illinois law, however, the burden fell to Van Diest to identify its proceeds. *See Funk*, 89 Ill. 2d at 33 ("We find no principles in law or equity which dictate that the innocent third party must suffer the consequences of Funk's predicament. . . . Funk failed to offer the proof required to identify the claimed proceeds and is not now entitled a second opportunity to do so.") Because Van Diest did not present evidence that it could do so, we are compelled to affirm.

## III. CONCLUSION

For the foregoing reasons, the decision of the district court is AFFIRMED.

A true Copy:

    Teste:

_____
                          *Clerk of the United States Court of*
                          *Appeals for the Seventh Circuit*